**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

PRECISION PIPELINE LLC,

        *Plaintiff*,

    v.

DOMINION TRANSMISSION, INC.,

        *Defendant*.

Civil Action No. 3:16-cv-00180-JAG

## DEFENDANT DOMINION TRANSMISSION, INC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

COMES NOW Defendant Dominion Transmission, Inc. ("Dominion"), by counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support of its Motion to Dismiss states as follows:

## INTRODUCTION

Precision's substantive claims are finally before the Court after years of protracted litigation wherein Dominion sought to enforce Precision's compliance with the dispute resolution and forum selection clauses of the parties' contracts. For years, Precision repeatedly ignored and violated these clauses by filing lawsuits in improper fora and without pursuing the mandatory ADR process. Like its forum shopping and other tactics, however, Precision's Complaint also fails on the merits as discussed below.

This case arises from Precision's attempt to recoup over $80 million in time-barred, unsubstantiated change orders and other payment requests relating to the work Precision performed as contractor on Dominion's Appalachian Gateway Project. Precision's demand, which is more than *half* of what Dominion has already paid Precision in base-lay price and

approved change orders, consists largely of unspecified efficiency losses and expenses related to foreign line crossings[1] for which Precision bore responsibility under the relevant contracts.  In contravention of its agreement to perform the contracts for a certain price, Precision seeks to nearly double its compensation under the contracts through legally deficient, albeit creative, causes of action.

For example, faced with its failure to follow the contract procedure for submitting change orders and claims, Precision asserts that the parties *abandoned* the contract and that Precision should receive compensation on a quantum meruit basis.  Similarly, in an attempt to avoid the assumption of risk and familiarity with site clauses, which are standard in the construction industry, Precision claims that Dominion made cardinal changes to the scope of work and defrauded Precision by misrepresenting the number of foreign line crossings Precision would encounter.  Precision makes these claims even in light of a recent decision by the Texas Supreme Court where Precision's parent company lost an identical lawsuit on the foreign crossings issue. Additionally, despite the transfer of this case to Virginia, Precision continues to seek relief under inapplicable Pennsylvania state statutes.

At the outset, however, Precision has simply failed to plead its entitlement to the recovery it seeks, including whether it complied with the mandatory change order submission procedure— a condition precedent to payment.  While the Complaint contains several categories of damages including special work and efficiency losses, Precision fails to specify what claims fall into those categories and whether it followed the submission procedure with respect to those claims.  As a glaring example, Precision provides one paragraph in support of its $50 million loss of efficiency claims.

---

[1]      A "foreign line crossing" is a preexisting underground utility "crossing or otherwise appurtenant" to the right-of-way in which Dominion's pipelines were laid.  <u>See</u> Compl. ¶ 80.

Pleading deficiencies notwithstanding, most of Precision's claims also fail as a matter of law.  First, the assumption of risk and familiarity with site clauses in the contracts bar Precision's claims in connection with foreign line crossings.  This claim further fails, as explained by the Texas Supreme Court, because Precision bore the sole responsibility for the work performed in connection with the undiscovered crossings.  Second, the express contracts between the parties preclude Precision's six quasi-contract counts.  These various counts are also barred by statutes of limitations or, in the case of abandonment and cardinal change, do not state a recognized cause of action.  With respect to constructive fraud, Precision has failed to plead this cause of action with sufficient specificity.  This claim, moreover, is barred by the integration clause in the contracts.  Lastly, the transfer of this case to this Court has extinguished Precision's claims based on Pennsylvania state statutes.  Additionally, Precision has failed to state a claim under these statutes and, with respect to Pennsylvania's "One-Call" statute, no private right of action exists for the losses Precision has alleged.

The Complaint, accordingly, fails to plead—let alone establish—entitlement to any relief Precision seeks, and this Court should dismiss the Complaint with prejudice as a result.

## BACKGROUND AND PROCEDURAL HISTORY

In early 2011, Dominion and Precision executed two separate, but substantively identical, Pipeline Construction Contracts (the "Contracts") for the construction of three natural gas pipelines, designated TL-570 ext. 1, TL-492 ext. 5, and TL-590 (the "Project"), spanning approximately 55 miles in West Virginia and Pennsylvania.  See Compl. ¶¶ 1, 96.  Copies of the Contracts governing the construction of Pipelines TL-590 and TL-492 and Pipeline TL-570 are

attached hereto as **Exhibit A and B**[2], respectively.[3]   Prior to the execution of the Contracts, in submitting its bid to Dominion, Precision accepted the Contracts with "no exception."  See Ex. A, Addenda B-3 Contractor's Exceptions and Alternatives.

Specifically, TL-590 and TL-492 involved approximately 43 and six miles of pipeline construction, respectively, in Greene County, Pennsylvania, and Marshall County, West Virginia.  See Ex. A at A-2-3.  TL-570, which spans approximately five and a half miles, is located in Kanawha County, West Virginia.  See Ex. B. at A-1.  The combined fixed price for the construction of TL-590 and TL-492, which represents more than 90% of the overall cost of the project, was $73,500,000 based on the estimates provided by Precision.  See Ex. A at 2.  Under the Contracts, Precision agreed to construct the pipelines by August 2012.  See Ex. A at A-2.  Precision finished the work on the Project by the required in-service date and did not seek an extension from Dominion.  See Compl. ¶ 228.

Precision also agreed to construct the Project for the fixed price specified in the Contracts and further acknowledged that it was not entitled to any price adjustments in the event it failed to properly bid on the Contracts.  Exs. A & B, Art. 1.1, 3.7.   Specifically, in executing the Contracts, Precision agreed as follows:

> 3.7    Familiarity with Project Site; Conditions Affecting the Work. Contractor agrees and acknowledges that it is familiar with the Work, the Project Site(s) (to include having made all necessary visits to the Project Site(s) before executing this Contract), other local conditions that may affect the Work, and shall furnish the supervision, labor, equipment, tools, materials, and supplies required to

---

[2]     Each Contract contains voluminous exhibits most of which are not relevant to this Motion.  As a result, only the exhibits Dominion considers relevant have been attached hereto. Complete versions of the Contracts are available upon request.

[3]     Although Precision did not attach the Contracts to the Complaint, it heavily relies on the Contracts for the majority of its claims.  As a result, the Contracts have been incorporated by reference and can be considered without converting this Motion into one for summary judgment. Pueschel v. United States, 369 F. 3d 345, 353 n.3 (4th Cir. 2004).

provide the Work in accordance with the terms of this Contract for the Contract Price.

> (a)     ***Contractor acknowledges that it has investigated and satisfied itself as to the conditions affecting the Work***, including but not limited to those bearing upon: (i) the transportation, disposal, handling and storage of wastes and materials, (ii) the availability of labor, utilities, and forms of transportation, including roads, (iii) the uncertainties of weather, river stages, tides or similar physical conditions as pertains to the Work, (iv) the conformation and condition of the ground, (v) the character of the equipment and facilities needed preliminary to and during performance of the Work, and ***(vi) the character, quality and quantity of surface and subsurface materials or obstacles to be encountered***. Any failure by Contractor to acquaint itself with the available information shall not relieve it from responsibility for properly estimating the· difficulty or cost of successfully perfo1ming the Work. DTI assumes no responsibility for any conclusions or interpretations made by Contractor on the basis of the information made available by DTI, other than information contained in or referenced in this Contract. See Exs. A & B, Art. 3.7 (emphasis added).

Additionally, the Contracts include an integration clause that precludes the parties' reliance on representations or statements that precede the execution of the Contracts:

> 2.3     Entirety. This Contract, together with all attachments and incorporated references, is the entire agreement between DTI and Contractor with respect to the Work and supersedes any prior or contemporaneous agreement or understanding between the Parties regarding the subject matter hereof. The Parties shall not be bound by or be liable for any statement, representation, promise, inducement or understanding of any kind or nature not set forth or provided for herein. No prior course of dealing, usage of trade or course of performance shall be used to supplement or explain any term, condition or instruction used in this Contract, nor shall the same be deemed to effect any amendment hereto. See Exs. A & B, Art. 2.3.

Notwithstanding this language, during the construction and after the Project was completed, Precision submitted numerous change orders and other requests for payment in connection with additional work it performed for the Project. See, e.g., Compl. ¶ 33. Precision alleges that the changes to the scope of the Project necessitated the additional work. See, e.g. id. ¶ 29. Specifically, Precision claims that Dominion and its surveyors misrepresented the scope of work in the pre-bid documents, specifically concerning the number of foreign line crossings

Precision would encounter during construction.  Id. ¶¶ 192-95.   In making these claims, Precision fails to account for the contractual provisions quoted above that required it independently to investigate the site prior to accepting the Project.  See Exs. A & B, Art. 3.7.

Although Precision acknowledges that the Contracts contain a mandatory change order submission process, Precision has failed to allege that it complied with that process.  Compl. ¶ 101.  In fact, Precision has provided as little detail as possible surrounding its claims, in an apparent effort to obscure the numerous timeliness and substantiation issues that are dispositive of its claims.  Instead, Precision contends that the parties abandoned the Contracts, making the change order submission mechanism effectively inapplicable.  Id. ¶ 186.   Precision also claims, however, that notwithstanding its belief that the Contracts no longer apply, it continued to follow the change order submission process.  Id. ¶¶ 161-170.

Based on the alleged changes to the scope of work, Precision has sued Dominion for breach of contract (Fourth Count) and under a variety of quasi-contract theories, including cardinal change (First Count), abandonment (Second Count), constructive fraud (Third Count), quantum meruit (Fifth Count), and unjust enrichment (Eighth Count[4]).  See generally Compl. Additionally, Precision has alleged violations of two Pennsylvania state statutes, the Pennsylvania Contractor and Subcontractor Payment Act and Pennsylvania's Underground Utility Line Protection Law.  See Compl. Sixth & Seventh Counts.  In connection with these claims, Precision has demanded in excess of $80 million, including conclusory claims for: (1) $7 million "worth of 'special work' and other unit price claims"; (2) $5 million "worth of discrete

---

[4]      The Complaint mistakenly contains two counts labeled "Seventh Count."  The unjust enrichment count, which appears eighth in the Complaint, is referred to herein as the "Eighth Count" even though it is titled "Seventh Count" in the Complaint.

time and materials claims"; (3) $12 million in claims pertaining to foreign line crossings[5]; (4) $50 million in costs relating to unspecified "losses of efficiency"; and (5) $12 million in retainage.

The procedural history of this dispute is not without importance.  In 2013, Dominion filed a related lawsuit in this Court seeking breach of contract and declaratory judgment relief in connection with Precision's initiation of mechanic's liens lawsuits in violation of the dispute resolution procedure set forth in the Contracts.  See Dominion Transmission, Inc. v. Precision Pipeline, Inc., Civil Action No. 3:13cv442-JAG.  On Precision's motion, this Court dismissed that case without prejudice and directed the parties to engage in the ADR procedure as required by the Contracts.

Without participating in an ADR proceeding, and in disregard of the Court's directives, Precision filed this action on July 28, 2015 in the Western District of Pennsylvania.  Precision's conduct violated not only this Court's order and the ADR provision of the Contracts, but also the forum selection clause which directed the parties to file all lawsuits in this Court.  On Dominion's motion, which Precision vehemently opposed, the WDPA transferred this case to this Court on March 21, 2016.  (Docket No. 32.)  On April 5, 2016, this Court entered an order staying this case pending mediation.  (Docket No. 35.)  The parties engaged in mediation on May 26, 2016, but did not succeed in resolving this matter.  The stay imposed by this Court lifted on June 6, 2016, and this matter is now ripe for adjudication.

---

[5]     Notably, Precision has also sued Dominion's surveyors, Trico Surveying and Mapping, Inc. and G-A-I Consultants, Inc., in the Western District of Pennsylvania, alleging that the surveyors failed to exercise reasonable care in identifying foreign line crossings on Dominion's alignment sheets.  See Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al., Civil Action No. 2:13-cv-01823-CB, Docket No. 1 ¶¶ 52-53, 68.  This Court can take judicial notice of the record in Precision's lawsuit against the surveyors.  See Colonial Penn. Ins. Co. v. Coil, 887  F.2d 1236, 1239 (4th Cir. 1989).

**STANDARD OF REVIEW**

**A.      Federal Rule of Civil Procedure 12(b)(6).**

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A 12(b)(6) motion tests the legal sufficiency of the complaint. Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). The reviewing court must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994). While Rule 8 requires only a statement "showing that the pleader is entitled to relief," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citation omitted).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard (Id.), and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555. Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a district court may consider the facts alleged in the complaint, as well as "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Moore v. Flagstar, 6 F. Supp. 2d 496, 500 (E.D.

Va. 1997) (internal quotations omitted).  The Court may also look to documents incorporated by reference without converting a Rule 12(b)(6) motion into a motion for summary judgment. Pueschel, 369 F. 3d at 353 n.3.  Additionally, when a document attached to or incorporated into the complaint contradicts the allegations, the document prevails.  Homeowner's Ass'n v. Openband at Broadlands, LLC, 713 F.3d 175, 182 (4th Cir. 2013).

### B.    Federal Rule of Civil Procedure 9(b).

Rule 9(b) imposes a heightened pleading standard for fraud claims.  Fed. R. Civ. P. 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed.  R. Civ. P. 9(b).  To satisfy this standard, a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  In re Mut. Funds Inv. Litig., 566 F.3d 111, 120 (4th Cir. 2009) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)), rev'd sub nom. on other grounds, Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011).

### ARGUMENT

### A.    Precision has failed to state a claim for a breach of contract.

Under Virginia law, the party asserting a breach of contract must plead and prove: (1) the existence of an enforceable obligation owed by the defendant; (2) the defendant's breach of that obligation; and (3) resulting damage to the plaintiff.  Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 671 S.E.2d 132, 136 (2009)).  A claim for a breach of contract, even if it is grounded in the language of the operative agreement, must contain more than "bare assertions." See, e.g., Van Leer v. Deutsche Bank Securities, Inc., 479 Fed. Appx. 475, 480 (4th Cir. 2012). In Van Leer, for example, the plaintiff claimed that the defendant "breached its contractual

obligations by using the [confidential] information that it received" from the plaintiff for "its own purchase [of the plaintiffs former waste-disposal facility] from the bankruptcy action." Id. The Fourth Circuit concluded that, absent an explanation what confidential information the bank allegedly used or how it used it, the plaintiff had failed to plead the breach of contract claim. Id.

Here, Precision's Complaint states, among others, the following conclusory allegations of breach of contract in support of the Fourth Count:

> DTI breached many of its express obligations under the Pipeline Contracts and it also breached various implied-in-law duties and obligations arising out of and/or through Pipeline Contracts.  Compl. ¶ 206.

> Precision submitted dozens of change orders to DTI under Pipeline Contracts . . . for additional work falling outside of Precision's agreed scope of work that was necessary to complete the Pipeline Projects on schedule.  DTI failed to approve many of Precision's proposed change orders, thereby materially breaching the Pipeline Contracts.   Compl. ¶¶ 207-08.

> DTI abused and breached the Pipeline Contracts' change order clause by ordering excessive changes beyond the general scope of work that the Parties originally agreed to when they entered into the Pipeline Contracts.  Compl. ¶ 220.

These allegations of breach, as well as other allegations not quoted herein, fail to state a plausible claim for a breach of the Contracts.  Precision's allegations lack the specific details surrounding the alleged breaches, including, but not limited to: (1) facts leading up to Precision's change order requests and performance of additional work; (2) facts surrounding Dominion's rejection of Precision's claims; (3) facts relating to the "dozens of change orders," including the change orders at issue, the work allegedly performed pursuant to those change orders, and the dates Precision submitted those change orders for Dominion's consideration; and (4) facts in support of Precision's $86 million demand.

While Precision focuses the majority of its discussion on the undiscovered foreign line crossings—an allegedly $12 million item[6]—Precision provides absolutely no facts in support of its other claims, including "$7 million worth of 'special work' and other unit price claims" and "$5 million worth of discrete time and materials claims."  <u>See</u> Compl. ¶ 165.  Perhaps most egregious of all is Precision's demand for costs "in excess of $50 million," which Precision vaguely describes in a single paragraph as "substantial losses of efficiency and impacts due to, among other things, the cumulative impacts of the enormous hardships to Precision's work."  See Compl. ¶ 166.  Rhetoric aside, Precision does not provide a single fact in support of its $50 million claim for unspecified "substantial losses of efficiency and impacts."

"In omitting this critical discussion," Precision has engaged "in little more than a 'formulaic recitation of the elements of a cause of action.'"  <u>Van Leer</u>, 479 Fed. Appx. at 480 (quoting <u>Twombly</u>, 550 U.S. at 555).  Because Precision has failed to state a facially plausible claim for a breach of the Contracts under any of the theories it raises in the Complaint, and because none of Precision's allegations is supported by facts, this Court is not required to accept Precision's bare assertions and should dismiss the Fourth Count in particular and the Complaint in general with prejudice.

**B.     Precision has failed to plead compliance with change order submission procedure under the contracts.**

Although Precision relies on several provisions of the Contracts in support of its theories, it conveniently omits any discussion of Article 12.2, which provides in pertinent part:

> 12.2 Contractor Requests for a Change Order.  If Contractor desires a Change Order, Contractor shall give DTI Notices **within five (5) Days** after Contractor knows or should have known of the occurrence of the event giving rise to such request.  Such Notice shall include an appropriate statement setting forth the

---

[6]     As set forth *infra*, Precision fails to state a claim in connection with the foreign line crossings as a matter of law.

reasons why Contractor believes additional compensation or additional time should be granted, the detailed nature of any costs to be incurred, including reasonable adjustment to other applicable Contract provisions, and the probable length of any delay in performance of the Work. . . .

> 12.2.1 Failure to Comply Deemed a Waiver.  **Failure to comply** with the requirements of this Section 12.2 **shall constitute a waiver** by Contractor **of any and all Contractor requests for Change Orders not pursued in accordance with the terms herein**.

Virginia law favors strict compliance with notice and claim submission requirements contained in construction contracts.  Failure to follow the required procedure generally leaves the contractor without a remedy.  Pa. Elec. Coil, Ltd. v. City of Danville, 4:06cv80, 2008 U.S. Dist. LEXIS 27630, at *6 (W.D. Va. Apr. 4, 2008); see also Perry Eng'g Co., Inc. v. AT&T Comm's, Inc., 92-2050, 1993 U.S. App. LEXIS 17432, at *15-16 (4th Cir. July 13, 1993) (affirming summary judgment where contractor failed to comply with changes section of contract); McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906, 922 (E.D. Va. 1989)   (holding that contractor's claim for additional compensation was barred because of failure to promptly notify owner); United States v. Centex Constr. Co., 638 F. Supp. 411, 413 (W.D. Va. 1985) (granting summary judgment where contractor's failure to comply with seven-day notification clause barred subsequent claim for additional payment and noting that "Virginia courts have upheld such contractual clauses [requiring notice] between contractors and subcontractors for nearly a hundred years");  Blake Constr. Co. v. Upper Occoquan Sewage Auth., 266 Va. 564, 579 (2003) (upholding denial of contractor's claims where notice was untimely).

The very purpose of provisions akin to Article 12.2 of the Contracts is to avoid disputes such as this one.  Atl. & Danville Ry. v. Del. Constr. Co., 98 Va. 503, 511 (1900).  In the construction industry in general, "it is reasonable for an owner to protect itself by contractual language against the assertion of claims and demands about which it may know little or nothing

until after the project has progressed to other stages or is substantially completed and the owner's funds have been expended." D.R. Hall Constr., Inc. v. Spotsylvania Cnty. Bd. of Supervisors, 40 Va. Cir. 260, 262-63 (Spotsylvania 1996).

In addition to being strictly mandatory, notice provisions serve as conditions precedent to payment for additional work and also to seeking relief in judicial or alternative dispute resolution proceedings. See Perry Engineering, 1993 U.S. App. LEXIS 17432, at *16 ("Because submission of a timely proposal was a condition precedent to AT&T's duty to pay for increased costs, and because this condition was never satisfied, AT&T never became liable for the additional expenses."); West v. United States, 907 F. Supp. 154, 159 (E.D. Va. 1995) (holding that giving of notice is condition precedent); Elec. Constrs., Inc. v. Fid. & Deposit Co., 3:13-cv-00514, 2015 U.S. Dist. LEXIS 39860, at *20-21 (D. Conn. Mar. 30, 2015) ("[N]otice requirements are enforceable as preconditions to bringing claims, except where waiver or estoppel can be proven.").

Compliance with a condition precedent must be pled and proven under Virginia law. TC Midatlantic Dev., Inc. v. Commonwealth, 695 S.E.2d 543, 547 (Va. 2010); Fed. R. Civ. P. 9(c) (requiring plaintiff to plead that "all conditions precedent have occurred or been performed").

Here, Dominion chose to protect itself against unprecedented claims and demands by including Article 12.2 in the Contracts. Article 12.2 represents the method Precision agreed to follow in order to seek recovery from Dominion in connection with any change order requests. Precision's obligation to comply with Article 12.2 was absolute, and its failure to do so bars its right to seek a remedy for any of the alleged breaches. Pennsylvania Elec. Coil, 2008 U.S. Dist. LEXIS 27630, at *6.

Precision's 268-paragraph Complaint does not contain a single mention of compliance with Article 12.2 in particular or conditions precedent in general.   See generally Compl. Precision failed to plead, let alone prove, that it followed the procedure set forth in Article 12.2, which is a condition precedent to Precision's recovery for the claims it asserts in the Complaint, and that it followed the procedure in a timely manner.   Perry Engineering, 1993 U.S. App. LEXIS 17432, at *16.   As a result, Precision cannot claim that it "performed its obligations under the Pipeline Contracts," and this Court should dismiss the Complaint with prejudice. Compl. ¶ 205.

In addition to failing to allege compliance with Article 12.2, Precision has also failed to establish that Dominion has waived any of the requirements contained in the Contracts. Precision contends that the parties, allegedly due to the changes requested by Dominion, "disregarded various provisions of the Pipeline Contracts both in general terms and with specific reference to handling changes, extra work and additional work."   See Compl. ¶ 185. Specifically, Precision alleges that the parties discussed the purported additional work, Precision performed the work, and Precision submitted written change orders after the fact. See Compl. ¶¶ 153-59.   Using this modified procedure, Precision maintains, Dominion approved at least nine change orders. See id. ¶ 159.   As a result, Precision alleges that Dominion "agreed to waive the Pipeline Contracts' change order provisions set forth in Article 12." See id. ¶ 224.

At the outset, the Contracts themselves preclude any modification through course of dealing.   Specifically, Article 2.3 of the Contracts provides that "No prior course of dealing, usage of trade or course of performance shall be used to supplement or explain any term, condition or instruction used in this Contract, nor shall the same be deemed to effect any amendment thereto."   Exs. A & B, Art. 2.3.   As a result, the parties could not have modified the

14

requirements of Article 12.2 through course of dealing as to give any binding effect to the alleged deviations from the change order requirement.

Additionally, Precision bears the burden of showing through clear and convincing evidence that Dominion waived the written change order requirement or other contractual provisions.  Artistic Stone Crafters, Inc. v. Safeco Ins. Co. of Am., 726 F. Supp. 2d 595, 603 (E.D. Va. 2010) (citations omitted).  In Artistic Stone, the court declined to find a waiver of the written change order requirement, as alleged by a subcontractor, where: (1) the contractor did not indicate its intent to waive  the requirement; (2) although oral promises were made, the parties also executed written change orders; and (3) the contractor did not pay for claims not included in a change order.  726 F. Supp. 2d at 603.

Similarly, in Carolina Conduit Sys. v. MasTec N. Am., Inc., 3:11cv133, 2011 U.S. Dist. LEXIS 122578, at *4. (E.D. Va. Oct. 24, 2011), the subcontractor failed to establish waiver of the change order requirement through oral modification and course of dealing.  Notably, it was MasTec—Precision's parent company[7]—that argued that its employee's oral reassurances "not to worry" about written procedure did not amount to a waiver.  Id.  The court agreed and held that where the party alleging waiver submits change orders during the course of the project, it fails to meet its burden of showing waiver of the change order requirement by clear and convincing evidence.  Id.

Here, although Precision alleges that Dominion approved additional work without a change order or accepted change orders after orally approving additional work, Precision also states that it attempted to follow the change order procedure as written by submitting written change orders before incurring actual work.  See Compl. ¶ 162 ("Precision submitted several

---

[7]      (See Docket No. 40.)

proposed change orders in an attempt to establish an agreed-upon unit price for the unidentified Foreign Crossings.").

Precision has not sufficiently alleged that Dominion intended to waive the change order requirements appearing in Article 12.2.  Precision also admitted that it attempted to follow the change order procedure as written during the course of the Contracts.  Under the holdings of Artistic Stone and Carolina Conduit, Precision cannot establish a waiver of contractual prerequisites, and this Court should dismiss the Complaint for failure to allege compliance with Article 12.2 of the Contracts.

**C.      The Assumption of Risk and Familiarity with Site Clauses of the Contracts bar Precision's claims, including its claim in connection with the foreign line crossings.**

Precision asserts that due to a series of conditions over which it allegedly had no control, Precision's work "was negatively impacted and was significantly and fundamentally changed." See Compl. ¶ 28.  This assertion, for the most part, concerns Precision's claims in connection with the undiscovered foreign line crossings, which Precision claims fall outside of the "expected scope of work."  See, e.g., Compl. ¶ 135.  Specifically, Precision contends that it was misled by Dominion's representations in the pre-bid documents concerning the number of foreign line crossings.  See id. ¶ 144, 196-96.  The Contracts, as well as case law addressing similar factual scenarios, preclude Precision's claims.

By executing the Contracts, Precision acknowledged its familiarity with the worksite, including the "condition of the ground" and "the character, quality and quantity of surface and subsurface materials or obstacles to be encountered."  See Exs. A & B, Art. 3.7 (a).  Precision further agreed that its failure to acquaint itself with the site conditions did not remove its responsibility to perform the work within the cost parameters specified in the Contracts.  Id.

Courts have routinely enforced similar assumption of risk and familiarity with site clauses. See United States v. Spearin, 248 U.S. 132, 136-37 (1918) ("The general rules of law . . . are well settled.  Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered."); Ruby-Collins, Inc. v. Charlotte, 740 F.Supp. 1159, 1176-77 (W.D. N.C. 1990), aff'd 930 F.2d 23 (4th Cir. 1991) (dismissing claim for additional costs and holding that contractor assumed the risk that it would perform the contract for the amount of the bid); Assoc. Mech. Contrs., Inc. v. HDR Eng'g Inc., 97-2737, 1999 U.S. App. LEXIS 8262, at *9 (4th Cir. Apr. 29, 1999) (rejecting claim for additional compensation where contractor claimed to not have received sufficient information regarding a site condition because the contractor had a duty to investigate); Anderson v. Golden, 569 F.Supp. 122, 142 (S.D. Ga. 1982) ("It is an elementary principle of contract law that in order to recover for 'extras,' [sic] (the contractor) must show that they are in fact extras. Extra or additional work is work not contemplated in the original specifications. When the work performed is covered under the lump sum contract, the contractor cannot consider the cost of performance as an extra. In a fixed-sum contract, a contractor is not entitled to additional compensation simply because unforeseen difficulties are encountered"); El Paso Field Servs. v. L.P. MasTec N. Am., Inc., 389 S.W.3d 802, 812 (Tex. 2012) ("[T]he contract allocated risk for undiscovered foreign crossings to MasTec, and MasTec must bear the loss of additional costs associated with the unknown foreign crossings.").

Here, Precision accepted the Contracts without exception and agreed to perform the Contracts for a set price.  See Ex. A at B-3.  In apparent contravention of its representations, Precision now seeks to nearly *double* the price of the Contracts on account of more than $80

million in "extra work" it allegedly did not anticipate.  In light of the precedent above, this Court

should deny Precision's claims.

Moreover, <u>El Paso</u> is pertinent to the issue of foreign line crossings and especially telling

because in that case Precision's parent company, MasTec, Inc. (<u>See</u> Docket No. 40)

unsuccessfully raised the same claim concerning foreign line crossings as Precision does here.

In <u>El Paso</u>, the owner hired MasTec to replace a portion of a propane pipeline—MasTec's first

job installing a pipeline.  389 S.W.3d at 803.  MasTec claimed that, although the alignment

sheets provided by the owner identified 280 foreign crossings, it discovered 794 crossings.  <u>Id.</u> at

804 n.2.  MasTec sued the owner for breach of contract and fraud, and the jury awarded it

approximately $4.7 million in connection with the unidentified crossings.  <u>Id.</u> at 805.  Upon the

owner's motion, the trial court set aside the judgment, MasTec appealed, and the court of appeals

reversed.  <u>Id.</u>

The Texas Supreme Court reversed the appellate court, finding that MasTec was not

entitled to additional compensation in connection with the foreign crossings not shown on the

owner's alignment sheets.  <u>Id.</u> at 812.  Relying on a contractual clause substantively similar to

Article 3.7 of the Contracts, the court held that MasTec bore the risk for undiscovered foreign

crossings and concluded that "were we to hold in MasTec's favor, and conclude [the owner]

must bear the risk of unknown underground obstacles under this contract, we would render

meaningless the parties' risk-allocation agreement and ultimately prohibit sophisticated parties

from agreeing to allocate risk in construction contracts."  <u>Id.</u>

Similarly here, Article 3.7 allocated the risks relating to site conditions, including foreign

line crossings, to Precision.  <u>See</u> Exs. A & B, Art. 3.7.  Although Precision discovered additional

crossings not identified on Dominion's alignment sheets, the financial responsibility for those

crossings rests entirely with Precision, not Dominion.  El Paso, 389 S.W.3d at 812; Spearin, 248 U.S. at 136-37.  To hold otherwise would effectively nullify Article 3.7 and jeopardize the integrity of construction contracts in general.  At the very least, given MasTec's experience with foreign crossings in El Paso, Precision's claim that it expected to discover only the crossings identified on the alignment sheets (Compl. ¶ 199) or that it detrimentally relied on Dominion's pre-bid documents is disingenuous.  As a consequence, this Court should dismiss Precision's claims for compensation in connection with additional work, specifically including Precision's $12 million claim for undiscovered foreign line crossings.

> **D.**      **Precision's quasi-contract and quantum meruit claims fail as a matter of law.**

Five of the eight counts in the Complaint are based on quasi-contract and quantum meruit theories.  All of these counts fail for one or more reasons described below.

> **1.**      *The express Contracts between the parties preclude Precision's quasi-contract and quantum meruit claims.*

This Court should dismiss with prejudice Precision's claims grounded on quantum meruit, quasi contract, and unjust enrichment principles because these claims fail as a matter of law in light of the valid, express Contracts between the parties.  Quantum meruit and quasi contract relief is equitable in nature and is generally not available where a valid, clear and unambiguous contract "expressly delineate[s] the contractual obligations" of the parties.  See Artistic Stone Crafters, 726 F. Supp. 2d at 604 ("[B]ecause the Subcontract specifies a process for the reimbursement of additional, unanticipated costs incurred by Artistic in the cafeteria renovation project, Artistic is unable to obtain such reimbursement under a theory of quantum meruit."); WRH Mortg., Inc. v. S.A.S. Assocs., 214 F. 3d 528, 534 (4 Cir. 2000) ("Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie."); Carolina Conduits Sys., 2011 U.S. Dist.

19

LEXIS 122578, at * 6 (dismissing claims for quantum meruit where the contract contained a procedure for obtaining compensation for additional work at issue); Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir. 1988) ("An action for unjust enrichment is quasi-contractual in nature and may not be brought in the face of an express contract."); Trident Products & Servs., LLC v. Canadian Soilless Wholesale, Ltd., 859 F. Supp. 2d 771, 781-82 (E.D. Va. 2012), aff'd, 505 F. Appx. 242 (4th Cir. 2013) ("[F]or a court to award a quantum meruit recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter.").

Here, Article 12.2 of the Contracts expressly governs the process Precision had to follow to request compensation for additional work.  Precision has not alleged that the Contracts are unenforceable or otherwise invalid, and Precision's claim that Dominion has waived the formal change order procedure fails for the reasons stated *supra*.  As a result, the Contracts in general and Article 12.2 in particular bar Precision's First, Second, Third, Fifth, and Eighth Counts.

> 2.    *The applicable statutes of limitations partially bar Precision's claims.*

Under Virginia law, claims for unjust enrichment and quantum meruit are subject to a three-year statute of limitations.  See East West, LLC v. Rahman, 873 F.Supp.2d 721, 730 (E.D. Va. 2012) (unjust enrichment); Semenovich v. Project Performance Co., Inc., 1:14cv1780, 2016 U.S. Dist. LEXIS 35314, at *22 (E.D. Va. Mar. 18, 2016) (quantum meruit).  With respect to constructive fraud, the statute of limitations is two years.  Va. Code Ann. § 8.01-243(A); Schmidt v. Household Fin. Corp, II, 276 Va. 108, 117, 661 S.E.2d 834, 838 (2008).

Precision filed its Complaint on July 28, 2015 (Docket No. 1.)  Because Precision has alleged virtually no facts in support of its claims, it is impossible to ascertain to what extent the applicable statutes of limitations bar Precision's claims.  To the extent any of Precision's claims

or causes actions accrued prior to July 28, 2012, those claims and causes of action are time-barred and the quantum meruit and unjust enrichment claims should be dismissed with prejudice as to those claims.  As to constructive fraud, any claims that accrued prior to July 28, 2013, should be dismissed.

### 3.    *Cardinal change and abandonment are not recognized causes of action.*

Precision's First and Second Counts are titled Cardinal Change—Quasi-Contract (Quantum Meruit) and Abandonment—Quasi-Contract (Quantum Meruit), respectively.  Neither cardinal change nor abandonment is a cause of action; at best, they are affirmative defenses. Centex Constr. v. Acstar Ins. Co., 448 F. Supp. 2d 697, 715-16 (E.D. Va. 2006); Hubbard v. Stony Point Land, Inc., 457 B.R. 479, 484 (E.D. Va. 2011).   This Court, moreover, expressly determined that cardinal change is not a recognized cause of action.  See Centex Constr., 448 F. Supp. 2d at 715-16 ("Defendants also argue that Centex committed material breaches of the Subcontract by ordering Accutronics to perform additional work that constituted "cardinal changes" to the agreement. Defendants have not cited any authority holding that the cardinal change doctrine applies outside of the federal government contract law context, and the Court's own research has yielded no Virginia law suggesting that a "cardinal change" amounts to a breach of an agreement between private parties. Even upon assuming the application of the cardinal change doctrine to this subcontractor/general contractor dispute, however, the Court concludes that Defendants are unentitled to summary judgment on this affirmative defense.").

As a consequence, the First and Second Counts of the Complaint fail as a matter of law, and this Court should dismiss them with prejudice.

> *4.      Precision has failed to plead constructive fraud with specificity as required by Rule 9(b), and this claim is further precluded by Article 2.3 of the Contracts.*

A plaintiff alleging constructive fraud must prove: (1) a false misrepresentation of a material fact; (2) that was made negligently; (3) reliance on the representation to the plaintiff's detriment; and (4) resulting damage.  Caperton v. A.T. Massey Coal Co., Inc., 285 Va. 537, 740 S.E.2d 1, 9 (2013).  Like actual fraud, constructive fraud claims are subject to the heightened pleading standard of Rule 9.  Fed. R. Civ. P. 9(b); Murphy v. Capella Educ. Co., 589 Fed. Appx. 646, 652-56 (4th Cir. 2014) (affirming district court's dismissal of fraud and constructive fraud claims under Rule 12(b)(6) for failure to satisfy pleading standard under Rule 9(b)).

In Murphy, for example, the plaintiff alleged that the defendant made false statements because it "consciously gave the impression that a Capella student could enroll, take the requisite classes and obtain a Ph.D in the Leadership program" but failed to actually award the promised degree to the plaintiff, identified individuals as successful graduates of Capella when they were not, and represented that certain graduates were satisfied with the program.  589 Fed. Appx. At 653-55.  The Fourth Circuit found that none of these statements satisfied the Rule 9(b) standard because the "general assertions" the plaintiff provided did not rise to the level of "the who, what, when, where, and how" required by Rule 9(b).  Id. at 653.

Here, Precision alleges that Dominion and its surveyors "made positive representations to Precision of plans, specifications or conditions relative to the Pipeline Contracts' scope of work" and that the "disclosure of 90 Foreign Crossings on Alignment Drawings, E&S Plans, the Bid Documents, and the Pipeline Contracts constitutes a positive representation of specifications or conditions relative to the Pipeline Contracts' and the Pipeline Projects' scope of work." See

Compl. ¶¶ 125, 192.   Because Precision allegedly encountered 167 additional crossings, it alleges that the representations concerning crossings were false.  See Compl. ¶¶ 199-200.

These allegations fall short of the requirements of Rule 9(b) because Precision has failed to plead the "the who, what, when, where, and how" of the alleged fraud.  Murphy, 589 Fed. Appx. at 653.   Specifically, Precision has not described when and where the alleged misrepresentations were made, what individuals from the three companies involved made those representations and to whom, or—given Precision's contractual obligation to familiarize itself with the site conditions—why Precision alleges that it justifiably relied on the alleged misrepresentations.  See Compl. ¶ 197.  As a result, Precision has failed to state a viable claim for constructive fraud, and its Third Count should be dismissed with prejudice.

Assuming, *arguendo*, that Precision surmounts this pleading deficiency, the constructive fraud claim still fails in light of the Integration Clause of the Contracts.

Article 2.3 of the Contracts, titled Entirety, provides:

> This Contract, together with all attachments and incorporated references, is the entire agreement between DTI and Contractor with respect to the Work and **supersedes any prior or contemporaneous agreement or understanding** between the Parties regarding the subject matter hereof.  **The Parties shall not be bound by or be liable for any statement, representation, promise, inducement or understanding of any kind or nature set forth or provided for herein**.  No prior course of dealing, usage of trade or course of performance shall be used to supplement or explain any term, condition or instruction used in this Contract, nor shall the same be deemed to effect any amendment hereto."  Exs. A & B, Art. 2.3 (emphasis added).

Precision claims that it relied on various documents, including bid documents provided by Dominion and its surveyors, that allegedly showed an incorrect number of foreign line crossings.  See Compl. ¶ 125.   These documents, according to Precision, constitute the representations that give rise to Precision's constructive fraud allegations.  Id.   The bid documents and other related documents and communications by definition preceded the award

and execution of the Contracts.  As a result, Article 2.3 of the Contracts squarely precludes any reliance by Precision on any representations made in those documents.  Precision's constructive fraud claim should be dismissed as a result.

**E.    The transfer of this case to this Court extinguishes Precision's claims under Pennsylvania state statutes, and those claims further fail as a matter of law.**

In its Sixth and Seventh Counts, respectively, Precision alleges violations of the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73.P.S. Section 501 *et seq.* and Pennsylvania's Underground Utility Line Protection Law, Act 287 of 1974 ("One-Call Statute"), 73 P.S. Section 176 *et seq*.  See Compl. at 39-41.  Precision made these claims when it initially filed this lawsuit in Pennsylvania in violation of the forum-selection and choice-of-law clauses of the Contracts.  The law is clear, however, that upon transfer of a case to a forum the parties selected in their contract, the law of the transferor state ceases to govern.  Atl. Marine Constr. Co. v. United States Dist. Court for  the W. Dist. of Texas, 134 S. Ct. 568, 582-83 (2013).  As a result, Virginia law applies to this case and Precision's claims for violations of Pennsylvania law must be dismissed.  Id.

Typically, a federal court sitting in diversity must apply the law of the State in which it sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 494-96 (1941).  The Supreme Court subsequently carved out an exception to the Klaxon rule for transfers under 28 U.S.C. §1404(a), requiring application of the transferor state law in the transferee court.  Van Dusen v. Barrack, 376 U.S. 612, 639 (1964).  The rationale behind the exception sought to prevent defendants from seeking transfers to a jurisdiction whose laws favored their position.  Id. at 638.  In Atlantic Marine, the Supreme Court limited the Van Dusen exception to exclude Section 1404(a) transfers based on enforcement of a contractual forum-selection clause.  134 S. Ct. at 583. Specifically, the Supreme Court found that "In Van Dusen, we were concerned that, through a

§1404(a) transfer, a defendant could defeat the state-law advantages that might accrue from the exercise of [the plaintiff's] venue privilege. . . But as discussed above, *a plaintiff who files suit in violation of a forum selection clause enjoys no such privilege with respect to its choice of forum, and therefore it is entitled to no concomitant state law-advantages.*"  Id. (quotations omitted and emphasis added).

To allow a plaintiff to apply state law other than that of the state selected in the contract would "encourage gamesmanship" and "create or multiply opportunities for forum shopping." Id.  As such, the Supreme Court concluded, "The court in the contractually selected venue *should not apply the law of the transferor venue* to which the parties waived their right."  Id. (emphasis added); see also Iannello v. Busch Entm't Corp., 300 F.Supp.2d 400, 403 (E.D. Va. 2004) (finding that "the law of the transferor state should not govern" when transfer is based on enforcement of a forum selection clause).

Here, Precision sued Dominion in Pennsylvania in violation of the parties' forum selection and choice-of-law clauses making Virginia the agreed-upon forum.  See Exs. A & B, Art. 24.2.  The Western District of Pennsylvania transferred this case to this Court in recognition of the forum selection clause and noted that "Precision's initiation of suit here inevitably whiffs of forum/judge shopping."  (Docket No. 32 at 2.)  As a result, because Precision filed this suit in Pennsylvania in disregard of the forum selection clause, it is not entitled to any advantages under Pennsylvania law and this Court should not apply Pennsylvania law in adjudicating Precision's claims.  Atlantic Marine, 134 S. Ct. at 583.  As a result, Precision's claims in its Sixth and Seventh Counts, both of which are based in Pennsylvania law, must be dismissed as improper under Atlantic Marine.

Assuming, *arguendo*, that Precision's Pennsylvania law claims survive the transfer to this Court, they still fail because Dominion did not violate the statutes at issue. First, Precision alleges that Dominion violated CASPA because Dominion did not pay "amounts properly due and owing to Precision" and further because Dominion "failed to pay Precision its retainage." Compl. ¶¶ 241-42. CASPA requires a project owner to "pay the contractor strictly in accordance with terms of the construction contract." 73 P.S. § 505(a). Under CASPA, a contractor is entitled to payment from the owner only for performance "in accordance with the provisions of a contract." Id. § 504. Additionally, Section 509 requires release of retainage amounts that are "due to be released." Id. § 509.

As discussed in Section B *supra*, Precision had to comply with Article 12.2 of the Contracts as a condition precedent to payment for additional work. Perry Engineering, 1993 U.S. App. LEXIS 17432, at *16. Precision has not pleaded compliance with Article 12.2. As a result, Precision has failed to plead that it has performed the work "in accordance with the provisions of a contract" as to be entitled to payment under CASPA. 73 P.S. § 504; see also Boro Constr., Inc. v. Ridley Sch. Dist., 992 A.2d 208, 218-19 (Pa. Commw. Ct. 2010) (finding no owner liability under parallel statute where the contractor failed to meet condition precedent of submitting final application of payment).

Because Precision failed to satisfy Article 12.2, Dominion's payment obligations were never triggered and Dominion has not violated Section 505 of CASPA. Id. § 505. With respect to retainage, Precision has not pleaded that any withheld retainage is "due to be released." Id. § 509. As a consequence, Precision has not pleaded or established entitlement to payment under CASPA, and its Sixth Count, along with the request for interest and attorney's fees, should be dismissed with prejudice.

Second, Precision has failed to state a claim for violation of the One-Call Statute because that statute does not impose liability for purely economic losses for misrepresentations regarding utility locations[8]. See, e.g., Excavation Techs., Inc. v. Columbia Gas Co., 604 Pa. 50, 54-55, 985 A.2d 840, 842-843 (Pa. 2009) ("[O]ur legislature did not intend companies to be liable for economic harm caused by an inaccurate response under the Act, because it did not provide a private cause of action for economic losses."). In Excavation Technologies, the contractor performing work for a waterline extension project sued Columbia Gas in connection with missed or improperly marked gas lines which hampered the contractor's work and resulted in economic damages. Id. at 841. Columbia Gas filed a demurrer and the superior court sustained the demurrer. In upholding the superior court, the Pennsylvania Supreme Court examined the legislative history of the One-Call Statute and determined that no statutory basis exists to impose liability for purely economic losses. Id. at 844 ("[B]ut if utility companies are exposed to liability for excavators' economic losses, such costs would inevitably be passed on to the consumer; if this is to be done, the legislature will say so specifically. Until that day, we decline to afford heightened protection to the private interests of entities who are fully capable of protecting themselves at the public's expense.").

The facts of this case are practically indistinguishable from Excavation Technologies. Here, the Complaint is based in part on Dominion's alleged failure to mark all foreign line crossings. See Compl. ¶ 124. As a result of this failure, Precision claims, Precision had to perform additional work and incurred economic losses in the amount of "more than $12 million in claims pertaining to the direct costs of the additional work." See id. ¶ 165. Like the contractor in Excavation Technologies, Precision has not claimed any injury or property damage

---

[8]     Additionally, the Contracts place the responsibility on Precision to adequately utilize the One-Call System prior to construction. See Exs. A & B, Art. 3.16.

in connection with the undiscovered crossings.  985 A.2d at 841.   As a consequence, Precision's losses are purely economic in nature and, as such, not recoverable under the One-Call Statute. Id. at 842-43.  This Court should dismiss the Seventh Count with prejudice.

## CONCLUSION

For the foregoing reasons, Dominion Transmission, Inc. respectfully requests that this Court grant its Motion to Dismiss, dismiss the complaint in its entirety and with prejudice and award Dominion its costs incurred in defending this action and any other relief that this Court deems just and proper.

Dated:  July 6, 2016

Respectfully Submitted,

DOMINION TRANSMISSION, INC.

*By counsel*

MCGUIREWOODS LLP

_____/s/_____

Anastasia P. Cordova (VSB # 78936)
John D. Wilburn (VSB # 41141)
Richard D. Holzheimer (VSB # 40803)
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22102
Tel:  (703) 712-5000
Fax:  (703) 712-5281
acordova@mcguirewoods.com
jwilburn@mcguirewoods.com
rholzheimer@mcguirewoods.com

*Counsel for Dominion Transmission, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of July, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Christopher J. Belter (*pro hac vice* admission pending)
Ryan G. Pitman (*pro hac vice* admission pending)
Goldberg Segalla LLP
665 Main Street, Suite 400
Buffalo, NY 14203

Sean T. Stadelman
Goldberg Segalla LLP
1700 Market Street , Suite 1418
Philadelphia, PA 19103

Kevin J. McKeon
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, VA 22102
Telephone: (703) 749-1000
Facsimile: (703) 893-8029
Email: kmckeon@wthf.com

Thomas M. Wolf, Esq. (VSB No. 18234)
John "Jack" M. Robb, III, Esq. (VSB No. 73365)
Olaoluwaposi O. Oshinowo, Esq. (VSB No. 84992)
LeClairRyan, A Professional Corporation
919 East Main Street, 24th Floor
Richmond, VA 23219
Telephone: (804) 916-7143
Facsimile: (804) 916-7243
Email: thomas.wolf@leclairryan.com
        jack.robb@leclairryan.com
        olaoluwaposi.oshinowo@leclairryan.com

*Counsel for Precision Pipeline LLC*

_____/s/_____
Anastasia P. Cordova (VSB # 78936)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22102-4215

Tel:  (703) 712-5000
Fax:  (703) 712-5050
acordova@mcguirewoods.com

*Counsel for Dominion Transmission, Inc.*