**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

PRECISION PIPELINE LLC,

                 Plaintiff,

v.

DOMINION TRANSMISSION, INC.,

                 Defendant.

Civil Action No. 3:16-cv-00180-JAG

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION TO PRECLUDE EXPERT TESTIMONY**

Plaintiff Precision Pipeline, LLC ("Precision"), by counsel and pursuant to Federal Rules of Evidence 408, 702, and the Court's Order Extending Certain Deadlines of October 23, 2017 ("Amended Scheduling Order"), submits the following memorandum in support of its Motion to Preclude Expert Testimony with respect to several of the experts disclosed by Dominion Transmission, Inc. ("Dominion").

## INTRODUCTION

This motion concerns Dominion's apparent intention to elicit improper testimony from its designated experts (1) predicated on inadmissible settlement communications; (2) drawing legal conclusions as to the meaning and effect of contract provisions and the parties' performance in connection therewith, among other topics; and (3) lacking any independent expert analysis. Several of the expert reports disclosed by Dominion rely in part on a position statement dated

March 2014 ("Position Statement," the cover page of which is attached as **Exhibit A**),[1] which Precision prepared and submitted in the context and in furtherance of the executive settlement meetings between Precision and Dominion as provided in Article 23 of the parties' contract (attached without exhibits as **Exhibit C**). Such evidence is inadmissible under Fed. R. Evid. 408(a)(2). In addition, several of Dominion's expert reports disclose opinions that are legal conclusions or that are not based on any independent analysis. Such opinions are not proper subjects of expert testimony under Fed. R. Evid 702. Precision accordingly seeks to exclude any testimony from Dominion's experts on these topics.

## BACKGROUND

On November 17, 2017, Dominion disclosed an expert report by Mark Gentry of The Kenrich Group LLC (the "November Gentry Report," attached as **Exhibit D**). On December 19, 2017, Dominion disclosed expert reports by (1) Richard D. Fultineer and Mark L. Mezyk of Berkeley Research Group (the "Fultineer Report," attached as **Exhibit E**); (2) Mark Gentry of The Kenrich Group LLC (the "December Gentry Report," attached as **Exhibit F**); and (3) Richard P. Easler of the Berkeley Research Group (the "Easler Report," attached as **Exhibit G**). On January 3, 2018, Dominion disclosed an expert report by Jeffrey C. Woodcock (the "Woodcock Report," attached as **Exhibit H**). As described further below, the Fultineer Report and the December Gentry Report repeatedly cite and rely on the Position Statement, and all of the above-listed reports except for the December Gentry Report offer legal conclusions in the guise of expert opinions.

Precision's Position Statement was explicitly and indisputably furnished in the context of compromise discussions with respect to Precision's claims. The designation "Confidential &

---

[1] Contemporaneous with the instant motion, Precision will move to file the full Position Statement under seal as **Exhibit B** to enable the Court to assess the context and substance of the Position Statement.

Privileged: Prepared for Purposes of Mediation and for Settlement" appears on the cover page of

the document (*see* Ex. C), as well as on every other page (*see* Ex. B). In its "Introduction"

section, the Position Statement summarizes its context and purpose as follows:

> Pursuant to Article 23 of the Contract between Dominion and
> Precision, the parties are obligated to participate in a meeting of
> senior officers in an attempt to resolve disputes. Precision submits
> this Position Statement in connection with the upcoming officers
> [sic] meeting at Dominion's offices in Richmond, Virginia on
> March 12, 2014, and in furtherance of obtaining global settlement
> of its claims against Dominion.

(Ex. B at 2). This explicit statement leaves no doubt as to Precision's intent with respect to the

Position Statement.

The Fultineer Report relies on the Position Statement for assertions as to the number of

welds Precision had planned for tie-in crews to perform, the number of man-hours for tie-in

crews Precision expected to incur, the number of tie-in welds performed during certain time

periods, and the number of identified foreign utility crossings (or "Potholing stations").  (Ex. E at

68, 70, 72, 75, 77, 82, and 83).  It cites the Position Statement as purported support for its

rebuttal of the opinions disclosed by Precision's expert, David Vanderpool, with respect to the

number of additional foreign utility crossings and the extra work associated with them. (*Id.* at 7-

8).  Specifically, the BRG Report states, "The appropriate analysis and methodology to assess

additional work due to unknown foreign crossings is to determine the number of additional tie-in

welds and line breaks performed due to the unknown foreign crossing locations, which is an

analysis the Vanderpool Report does not present." (*Id.*).  The Fultineer Report then purports to

present this so-called "appropriate analysis" with reference to the Position Statement to reach a

conclusion that Precision encountered far less additional work than David Vanderpool identified.

(*Id.* at 65-77, 85).  In other words, BRG's experts have disclosed an opinion that challenges the

validity and/or amount of Precision's claim for additional foreign utility crossings based in part on information in the Position Statement.

The December Gentry Report cites the Position Statement for the contention that factors other than additional foreign utility crossings contributed to Precision's loss of productivity and alleges that such factors contradict or discredit Precision's pending claim for loss of productivity as set forth in the report of Precision's expert, William Schwartzkopf. (Ex. B at 8-9). The December Gentry Report goes on to cite the Position Statement for the claim that Precision "indicated that it was responsible for certain periods of lost productivity." (*Id.* at 9-10). Finally, the December Gentry Report cites the Position Statement at Attachment B.1 for a description of welding crew composition, which it apparently relies on in performing its own productivity analysis. Similar to the Fultineer Report, the December Gentry Report discloses an opinion, based in part on the Position Statement, that Precision's claim for lost productivity due to the additional foreign crossings is invalid, and/or that it is inconsistent with Precision's Position Statement.

The November Gentry Report offers impermissible opinions on the interpretation of the contract's warranty provision (Ex. D at 6), the meaning of the defined term "Defect" as referred to in the warranty provision (*id.* at 7), the meaning of the defined term "Base Lay" (*id.* at 9-10), and the scope of the contract's audit provision (*id.* at 12). It also fails to disclose any opinion based on independent expert analysis. Instead, it makes a legal conclusion as to Precision's liability for slip repairs and restoration work and sums the totals of invoices that purportedly represent Dominion's damages for these items. (*See id.* at 6-8) ("Per discussions with Dominion personnel, Precision was responsible to restore the ROW, including repairing slips on the ROW, within its two year warranty period. . . . In total, Dominion incurred $7,447,269 from 2013 to

4

2014 to repair slips and complete other non-slip restoration work that should have been completed by Precision within Precision's warranty period.").

The Fultineer Report purports to interpret the parties' contract repeatedly as to the contractual change order provisions and waiver of claims thereunder. (Ex. E at 18-20 (change order provisions and contractual waiver), 22-23 (change order provisions, contractual waiver, and change order backup requirements), 31 (change order provisions), 34 (waiver of change order claims and notice)). It also discloses legal conclusions couched as expert opinion on Precision's obligations with respect to environmental crew staffing under Section 19.1.1 and Exhibit A. (*Id.* at 25-26). Similarly, the Fultineer Report offers an interpretation of Precision's obligations with respect to the Base Lay work as related to reroutes. (*Id.* at 37). It offers specific opinions—which are, again, legal conclusions—on Precision's alleged waiver of claims for rock ditch footage and the contractual procedures for reconciling and invoicing unit pay items. (*Id.* at 38-39). Finally, the Fultineer Report opines on the meaning of the disclaimer/exculpatory language in Section 3.7 of the contract and the allocation of responsibility for excavation due diligence under Section 3.16 of the contract. (*Id.* at 111, 120).

The Easler Report also discloses legal opinions on the Section 3.7 of the contract (Ex. G at 3, 9-10, 12) and the change order provisions in Article 12 of the contract (*id.* at 23). It also offers legal conclusions as to key issues in dispute, including whether the parties modified the change order process, whether the for-bid alignment drawings provided by Dominion constituted a material false misrepresentation, the relationship and order of precedence between FERC regulations and state laws, and whether Precision complied with the contractual change order requirements. (*Id.* at 4, 8, 24).

Finally, the Woodcock Report purports to interpret the contract to find that it did not incorporate any exception taken by Precision in its bid (Ex. H at 8, 10) and offers opinions on the meaning of Section 3.7 (*id.* at 7, 10).

## ARGUMENT

### I.   Dominion's Experts Should Be Precluded from Testifying about or in Reliance on Precision's Position Statement.

Evidence of conduct or a statement made during compromise negotiations of a claim is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction . . . ." Fed. R. Evid. 408(a)(2). This Rule embodies the strong public policy of encouraging settlements. *Xcoal Energy & Res., LP v. Smith*, 635 F. Supp. 2d 453, 454 (W.D. Va. 2009) (citing *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654–55 (4th Cir.1988)). "By preventing settlement negotiations from being admitted as evidence, full and open disclosure is encouraged, thereby furthering the policy toward settlement." *Dupuy*, 856 F.2d at 654. In particular:

> The purpose of Rule 408 is to encourage parties to be able to meet and attempt to settle claims outside of court without fear of such efforts being brought before a jury by the other side as evidence of liability or lack thereof. It encourages frank and open discussion of the strengths and weaknesses of each side's case and helps lead to an efficient resolution of many cases without the unnecessary use of court and judicial resources.

*Polk v. BP Amoco Chem. Co.*, 586 F. Supp. 2d 619, 621 (D.S.C. 2008).

"To determine whether statements come within Rule 408, the inquiry is whether the statements or conduct were intended to be part of the negotiations for compromise." *ICAP, Inc. v. Glob. Digital Satellite Sys., Inc.*, 225 F.3d 654 (4th Cir. 2000). If the statements or conduct were intended to be part of the negotiations for compromise of the disputed issue, no evidence of or reference to them may be offered. *Light v. Allstate Ins. Co.*, 48 F. Supp. 2d 615, 617 (S.D.W.

Va. 1998). The protections of Rule 408 extend to written statements exchanged by parties during settlement negotiations. *See*, *e.g.*, *Johnson v. Robinson*, 987 F.2d 1043, 1048 (4th Cir. 1993) (timetable developed by prison officials to aid in ongoing settlement discussions with respect to implementation of a stipulated, court-approved agreement as to improvements to prison facilities would not be admissible as evidence); *Petty v. Freightliner Corp.*, 122 F. Supp. 2d 666, 669 (W.D. N.C. 2000) (letter from employer discussing its settlement position in disability dispute with employee was inadmissible to demonstrate falsity of employer's subsequent assertions); *Polk*, 586 F. Supp. 2d at 621-22 (letter from defendant to plaintiff discussing plaintiff's claims, sent pursuant to settlement meeting between the parties, was inadmissible to demonstrate defendant's acknowledgment of plaintiff's work); *Hospira, Inc. v. Alpha & Omega Transp. Servs., Inc.*, No. 1:06CV074, 2007 WL 1199124, at *2 (W.D.N.C. Apr. 20, 2007) (letter from defendant setting forth total amount of plaintiff's damaged product along with a value of the product was inadmissible under Rule 408); *see also M Consulting & Exp., LLC v. Travelers Cas. Ins. Co. of Am.*, 2 F. Supp. 3d 730, 735 (D. Md. 2014) (indicating in dicta that "any inferences or conclusions drawn" from a letter furnished during settlement discussions would be inadmissible under Rule 408). Such written statements need not comprise a settlement offer or position to fall within the broad scope of Rule 408's protections. *Polk*, 586 F. Supp. 2d at 622.

In *Petty*, 122 F. Supp. 2d at 669, the court considered the plaintiff's motion for reconsideration of a prior ruling by which the court had refused to consider portions of a letter sent by the defendant, Freightliner, during settlement negotiations. The plaintiff was an employee of Freightliner and a claimant under the Americans with Disabilities Act. *Id.* at 667. Plaintiff argued that the letter in question showed "the falsity of Freightliner's assertion that it was committed to returning Plaintiff to work as quickly as possible" in that the settlement

7

position conveyed by Freightliner in the letter proposed the employee's resignation. *Id.* at 669. The court refused to modify its finding that that Rule 408 and the policy behind it made the letter inadmissible, holding that the employer was not forced "to choose between open and frank discussion of settlement" and the protections of Rule 408. *Id.*

In *Polk*, 586 F. Supp. 2d at 620, the issue before the court was whether to preclude evidence of written statements made by the defendant in the context of resolution discussions. Plaintiff had initiated the breach of contract action based on alleged non-payment for fence repair work. *Id.* Plaintiff and defendant met to discuss the dispute prior to the commencement of litigation, after which defendant sent a letter to plaintiff. *Id.* at 620-21. The letter explicitly stated it was in reference to the prior meeting and contained an itemization of total invoices from plaintiff, including the invoice for the disputed work. *Id.* It also contained statements as to the total time spent by plaintiff's employees at defendant's facilities performing the work and presented a calculation of defendants' costs and profit in critiquing plaintiff's claims. *Id.* Plaintiff sought to introduce the letter as evidence at trial as an admission by defendant that defendant had performed the disputed work, which defendant opposed on the basis of Rule 408. *Id.* The court held that the letter, despite lacking any specific settlement offer or position, was "precisely the type of communication which Rule 408 seeks to encourage parties to engage in with the knowledge that the other side cannot use it against them in court." *Id.* at 622.

In this case, Dominion's experts are expressly relying on the Position Statement for the impermissible purpose of, in the language of Rule 408, "disprov[ing] the validity or amount of" Precision's claims. The Fultineer Report relies on statements as to quantities of tie-in welds from the Position Statement in attempting to rebut the analysis of Precision's own expert and to argue that unknown foreign utility crossings did not cause the degree of extra work claimed by

Precision. *See supra* at 3. This purpose is clearly within Rule 408's express prohibitions. Dominion's reliance on statements as to tie-in weld quantities is analogous to the attempted reliance by the plaintiff in *Polk* on statements by defendant as to the plaintiff's work, which that court found impermissible. *See* 586 F. Supp. 2d at 621-22. Like the letter in *Polk*, the Position Statement was explicitly in furtherance of a meeting of the parties in pursuit of resolution, and it presented an analysis of the claims at issue. Like the offering party in *Polk*, Dominion apparently intends to rely on protected settlement communications as evidence with respect to Precision's claims. This Court should not permit such use of the Position Statement.

Like the Fultineer Report, the December Gentry Report also relies on the Position Statement to attempt to disprove the validity of Precision's claims. *See supra* at 3-4. The December Gentry Report also cites the Position Statement "to impeach by a prior inconsistent statement or a contradiction" Precision's claim for lost productivity resulting from the unknown foreign utility crossings, which is a separately prohibited purpose under Rule 408. The December Gentry Report specifically states:

> As described above, Precision previously identified many different causes for its alleged productivity loss, however, in Mr. Schwartzkopf's current report he has indicated there is only one event that caused Precision's loss of productivity – unanticipated foreign crossings.

Ex. F at 9 (citing the Position Statement at pages 2-3). Setting aside the fact that this is a complete mischaracterization of Mr. Schwartzkopf's opinion, this opinion is a blatant violation of Rule 408. It is analogous to the impermissible purpose of the plaintiff in *Polk*, who sought to rely on a settlement communication to discredit defendant's subsequent litigation position. 586 F. Supp. 2d at 669. As in *Polk*, Dominion should not be permitted to introduce or rely on information in the Position Statement for such purposes.

**II.      Dominion's Experts Should Be Precluded from Testifying with Respect to Contract Interpretation, Other Legal Conclusions, and Opinions in Gentry's November Report Not Based on Independent Expert Analysis.**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."

Fed. R. Civ. P. 702 (emphasis added). Before the Court may admit expert testimony, it must make a threshold determination that the proposed expert is: (1) sufficiently qualified based on his or her experience to offer the proffered testimony and (2) the proffered testimony will assist the fact-finder in resolving a factual dispute. *See id.; see also Smithers v. C & G Custom Module Hauling*, 172 F. Supp. 2d 765, 771 (E.D. Va. 2000). While the Court has discretion in deciding whether to admit expert testimony under the foregoing standard, it is hornbook law that an expert may not testify as to matters of law. *See Forrest Creek Associates, Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987) (testimony concerning interpretation of a contract is a question of law not appropriate for expert testimony); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986) (holding in an action arising out of sale of limited partnership interests in tax shelter investment, testimony of legal counsel to partnership as to meaning and applicability of securities laws to transactions at issue was inadmissible).   The general prohibition against expert witnesses testifying as to matters of law is rooted in the fundamental principal that the Court is the sole authority on the law applicable to a dispute, and an expert should not be permitted to invade the province of the Court by opining as to matters of law.  *See Adalman*, 807 F.2d at 368.

Accordingly, it is "settled that it is typically improper for a court to rely on expert testimony for the purpose[ ] of interpreting certain terms and/or clauses of a contract." *Piankatank River Golf Club, Inc. v. Selective Way Ins. Co.*, No. 3:08cv606, 2009 WL 1321512, *4 (E.D. Va. May 11, 2009), citing *Forrest Creek Assocs., Ltd.*, 831 F.2d 1238, 1242 (4th Cir. 1987). "Such 'interpretative' testimony is improper under Rule 702." Id., *5. *See also America Online, Inc. v. St. Paul Merc. Ins. Co.*, 207 F. Supp.2d 459, 466 n.1 (E.D. Va. 2002), *affd*, 347 F.3d 89 (4th Cir. 2003) ("It is typically improper for a court to rely on expert testimony for purposes of interpreting the terms and clauses of a contract"); *Federal Ins. Co. v. New Coal Co.*, 415 F. Supp.2d 647, 656 n.5 (W.D. Va. 2006) ("the issue in this case is one of contract interpretation and thus expert testimony is not appropriate").

As set forth above, many of Dominion's designated experts have proffered numerous opinions in the form of legal conclusions on contract interpretation and other matters of law. *See supra* at 4. There is no question under the well-established law of this Circuit that such areas are the domain of the Court.

Dominion's expert reports on its back charges violate well established rules. "An expert cannot simply parrot his client's findings or calculations and then pass that data off as his own expert opinion." *Capital Concepts, Inc. v. Mountain Corp.*, 936 F. Supp. 2d 661, 671–72 (W.D. Va. 2013) (excluding defendant's expert testimony in copyright infringement case where expert merely "republished" defendant's controller information on direct costs and conducted no independent analysis). And, "a party may not filter fact evidence and testimony through his expert merely to lend credence to the same . . . .". *Kia v. Imagine Scis. Int'l, Inc.*, No. 08-5611, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010). "Nor is it proper to use an expert witness simply to summarize the evidence proffered by the party that hired him." *Robroy Indus.-Texas,*

*LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512, 2017 WL 1319553, at \*9 (E.D. Tex. Apr. 10, 2017) (citing *United States v. Brownlee*, 741 F.3d 479, 482 (7th Cir. 2014) (Posner, J.) ("[A]n expert witness may not simply summarize the out-of-court statements of others as his testimony. . . .  An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy.")). "An expert may not merely parrot or recite factual evidence without offering a valid expert opinion based on such evidence, nor may they attempt to lend credibility, as experts, to certain evidence relevant to disputed issues of fact."  *City of Mountain Park, Georgia v. Lakeside at Ansley, LLC*, No. 1:05-CV-2775, 2009 WL 10665770, at \*14 (N.D. Ga. Jan. 6, 2009), report and recommendation adopted as modified, No. 1:05-CV-2775-CAP, 2009 WL 10665812 (N.D. Ga. Oct. 5, 2009) (excluding expert testimony regarding amount of damages to municipal dam related to construction sediment in waterways, where expert performed no independent analysis and relied on an unverified government report).

In the November Gentry Report, Dominion's expert improperly asserts legal conclusions that Precision is liable for Dominion's back charges and, on the basis of those conclusions, that the sum of Dominion's invoices or expenses is the measure of Dominion's entitlement to its set-off claims.

Thus, with respect to the first opinion in his first report, Gentry states, "Per discussion with Dominion personnel, Precision was responsible to restore the ROW, including repairing slips on the ROW, within its two year warranty period."  (Ex. D at 6.)  Then, *without any analysis of causation and without obtaining information from either of the contractors who performed the work*, Gentry simply reviews their invoices and opines, "In total, Dominion incurred $7,447,269 from 2013 to 2014 to repair slips and complete other non-slip restoration work that should have been completed by Precision within Precision's warranty period."  (*Id*.at

8.)  Essentially, Gentry is just saying, "Dominion is entitled to the amount of its back charge for slip repair," without any expert analysis.

For the second opinion of his November Report (*id.* at 9-11), Gentry improperly opines on his interpretation of the contract, and then regurgitates Dominion's back charge for Base Lay Overpayment.  He basically just parrots his client's position without any independent analysis.

 For the third opinion of his November Report (*id.* at 12-13), Gentry states, "Based on Dominion's October 2012 measurement of actual quantities installed, Kenrich [Gentry's firm] determined that Dominion overpaid Precision for Curlex in the amount of $172,394 as shown in Table 7 below."  The table merely takes Dominion's alleged measurement of installed feet (not verified in any way by Gentry or Kenrich) and multiplies by the contract's unit price per square foot of Curlex.  Again, there is no expert analysis; there is only regurgitation of his client's position.

For the fourth and final opinion of his November Report (Ex. D at 13-14), Gentry again just passes through a figure from a third party.  Without talking to any witness as to causation of alleged road damage or reviewing any documents as to actual costs incurred to repair such alleged damage, Gentry opines that under the contract Precision is "responsible for" $43,000 of road damages allegedly suffered by Morgan Township.  This is not proper testimony for an expert—it asserts a legal conclusion and involves zero expert analysis.

## CONCLUSION

For the reasons set forth above, Precision respectfully requests that the Court enter an Order forbidding Dominion's experts from testifying as to or in reliance on the Position Statement, as to legal conclusions regarding contract interpretation, as to the opinions set forth in Gentry's November Report, and granting such further relief as the Court deems just and proper.

13

Dated: January 18, 2018          PRECISION PIPELINE, LLC


By: _____/s/_____

Christopher J. Belter, Esq. (NY Bar No. 2583136)
Ryan G. Pitman, Esq. (NY Bar No. 4819611)
Goldberg Segalla, LLP
665 Main Street
Buffalo, New York 14203

Telephone:    716.566.5400
Facsimile:    716.566.5401
Email:       *cbelter@goldbergsegalla.com*
           *rpitman@goldbergsegalla.com*

and

Thomas M. Wolf, Esq. (VSB No. 18234)
Kenneth T. Stout, Esq. (VSB No. 88027)
LeClairRyan, A Professional Corporation
919 East Main Street, 24th Floor
Richmond, Virginia 23219
Telephone:    804.916.7143
Facsimile:    804.916.7243
Email:       *thomas.wolf@leclairryan.com*
           *kenneth.stout@leclairryan.com*

*Counsel for Plaintiff Precision Pipeline LLC*

## CERTIFICATE OF SERVICE

I certify that on the 18th day of January 2018, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF System which will then send a

notification of such filing (NEF) to the following:

        M. Melissa Glassman, Esq. (VSB No. 27526)
        John D. Wilburn, Esq. (VSB No. 40411)
        Robert J. Farlow, Esq. (VSB No. 87507)
        McGuireWoods, LLP
        1750 Tysons Boulevard, Suite1800
        McLean, VA  22102
        Email:      *mglassman@mcguirewoods.com*
                          *jwilburn@mcguirewoods.com*
                          *rfarlow@mcguirewoods.com*

        Ryan D. Frei, Esq. (VSB No. 70996)
        Ashley P. Peterson, Esq. (VSB No. 87904)
        McGuireWoods LLP
        Gateway Plaza
        800 East Canal Street
        Richmond, VA 23219
        Email:      *rfrei@mcguirewoods.com*
                          *apeterson@mcguirewoods.com*

        *Counsel for Defendant Dominion Transmission, Inc.*

        By:    */s/ Kenneth T. Stout*
        Thomas M. Wolf, Esq. (VSB No. 18234)
        Kenneth T. Stout, Esq. (VSB No. 88027)
        LeClairRyan, A Professional Corporation
        919 East Main Street, 24th Floor
        Richmond, Virginia 23219
        Telephone:   804.916.7143
        Facsimile:    804.916.7243
        Email:      *thomas.wolf@leclairryan.com*
                          *kenneth.stout@leclairryan.com*

        *Counsel for Plaintiff Precision Pipeline LLC*