**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| PRECISION PIPELINE, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:16cv00180 (JAG) |
| | ) | |
| DOMINION TRANSMISSION, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Dominion Energy Transmission, Inc. f/k/a Dominion Transmission, Inc. ("Dominion"), by counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, submits this memorandum in support of its Motion for Partial Summary Judgment to the Complaint filed by Precision Pipeline, LLC ("Precision") and states as follows:

## I. INTRODUCTION

Dominion is entitled to summary judgment on Precision's unknown foreign crossings claim because the claim is barred by the doctrines of judicial estoppel, collateral estoppel, and preemption. Dominion is entitled to summary judgment on Precision's quasi-contract claims based on the applicable statute of limitations and because Precision is judicially estopped from asserting those claims in light of its prior representations to this Court, which resulted in the dismissal of the previous lawsuit filed by Dominion. *See Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13cv442 (E.D. Va.) (ECF No. 7-1 at 8) (ECF No. 25 at 11). Finally, Dominion is entitled to summary judgment on Precision's nine remaining change order claims because Precision failed to

comply with the contractual conditions precedent when submitting those change orders to Dominion.

For the reasons stated herein, the Court should grant Dominion's Motion for Partial Summary Judgment and enter judgment in favor of Dominion on Count 1 (Cardinal Change – Quasi Contract), Count 4 (Breach of Contract), Count 5 (Quantum Meruit – Quasi Contract), and Count 8 (Unjust Enrichment – Quasi Contract).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Although the facts must be viewed in the light most favorable to the non-moving party, where a motion has been properly supported, the non-moving party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Furthermore, "summary judgment must be entered against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The federal government regulates the natural gas industry through the Federal Energy Regulatory Commission ("FERC") which oversees the transportation and sale of natural gas in interstate commerce.  (Compl. ¶ 35).

2.      Dominion is a natural gas company engaged in the transportation of natural gas in interstate commerce.  As such, Dominion's activities are regulated by FERC.  (Compl. ¶ 36).

3.      In order for Dominion to construct the pipeline project at issue, it first had to file an application with FERC under Section 7(c) of the Natural Gas Act requesting authorization to construct, operate and maintain a natural gas pipeline and compression facilities in Pennsylvania and West Virginia.  (Compl. ¶ 39).

4.      On June 1, 2010, Dominion filed an application with FERC in connection with Dominion's Appalachian Gateway Project. (Compl. ¶ 40).

5.      TL-590 is one of the eight pipeline segments comprising Dominion's Appalachian Gateway Project. (Compl. ¶ 41).

6.      TL-590 is comprised of 42.3 miles of 30 inch diameter pipeline in Marshall County, West Virginia and Green County, Pennsylvania. *Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.) (ECF No. 14, ¶ 9), **Exhibit 1**.

7.      On June 16, 2011, FERC approved Dominion's application and issued an Order issuing a Certificate authorizing Dominion to construct the eight pipeline segments which comprise Dominion's Appalachian Gateway Project, including segment TL-590. (Compl. ¶ 42).

8.      On November 24, 2008, Dominion hired Trico Surveying and Mapping Inc., ("Trico") to provide, among other things, design, surveying, mapping and/or engineering services to Dominion in connection with the Project. (Compl. ¶ 20).

9.      Trico prepared the Alignment Drawings for the Project. (Compl. ¶ 69).

10.     Dominion hired GAI Consultants, Inc., ("GAI") to provide, among other things, design environmental and/or engineering services to Dominion in connection with the Project. (Compl. ¶ 21).

11.     GAI prepared the erosion and sediment control ("E&S") Plans for the Project. (Compl. ¶ 71).

12.     In October 2010, Dominion invited Precision and other contractors to bid on the construction of the Project. (Compl. ¶ 61).

13.     The Bid Documents for the TL-590 Contract were issued to potential bidders on November 11, 2010 and instructed bidders to submit proposals to Dominion on December 7, 2010. *Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.) (ECF Nos. 14, ¶ 18), **Exhibit 1**.

14.     Dominion provided a variety of documents to the potential bidders ("Bid Documents"). (Compl. ¶ 62).

15.     Among other things, the Bid Documents contained the Alignment Drawings prepared by Trico and the E&S Plans prepared by GAI. (Compl. ¶ 68).

16.     The Alignment Drawings specified the route of the pipeline corridor; demarked the project workspace, right of way, and access roads; provided certain construction specifications; depicted the elevation profile of the right of way; showed roads, fences, power lines, and other aboveground appurtenances to the right of way; and identified preexisting subsurface utility lines crossing or otherwise appurtenant to the right of way ("Foreign Crossings"). (Compl. ¶ 80).

17.     The E&S Plans were a corresponding series of drawings depicting one-mile sections of the Project which identified various environmental features, such as waterways and wetlands, and proposed E&S control measures, such as the installation of water bars, silt fences and other E&S control devices.  (Compl. ¶ 81).

18.     The Bid Documents also included a draft of the proposed Contract. *See* **Exhibit 2** (Taylor Dep., Ex. 55) (Request for Proposal "RFP Attachments").

19.     Precision submitted a bid proposal to Dominion on December 13, 2010 (Compl. ¶ 89).

20.     Precision's then-Manager of Estimating, Dave Bell, submitted a cover letter with Precision's bid which stated, in relevant part: "We have reviewed and understand the [Dominion] contract as presented in the RFP documents. Precision takes no exception to the contract and, as such, has not included a redlined version with this proposal." *See* **Exhibit 3** (Bell Dep., Ex. 35).

21.     Precision's cover letter to its bid also stated ". . . we suspect there may be some quantity of unknown pipelines to cross on these projects. This has been our experience in the recent past on similar type projects. We do not feel these unknown pipelines pose an unacceptable risk in terms of safety or our ability to install pipe as per our schedule. We propose that, should Precision be the successful bidder, we negotiate a crossing price for unknown lines prior to the start of construction." (*Id.* at §(d)).

22.     Precision signed the Contract on February 2, 2011, and Dominion signed the Contract on February 8, 2011. (Compl. ¶ 96).

23.     A true and accurate copy of the Contract between the parties for TL-590 is attached as **Exhibit 4** (Pipeline Construction Contract between Dominion Transmission, Inc. and Precision Pipeline, Inc. dated as of January 7, 2011 – Contract 2010-18: TL-590 & 492 70 x5).

24.     Precision never approached Dominion about negotiating a crossing price for unknown foreign lines prior to the start of construction on TL-590. *See* **Exhibit 5** (Bell Dep., 29:17-22; 35:20-22; 36:1-4).

25.     Precision began construction in August 2011. (Compl. ¶ 104).

26.     The construction of TL-590 involved clearing land along the pipeline right-of-way, excavation, installation of pipe, and the restoration of the right-of-way and surrounding area. (Compl. ¶ 3).

27.     On October 19, 2011, for the first time, Precision asked to submit "a unit lump sum price for all additional foreign line crossings not shown on the construction alignment sheets at the time of bid . . . [and] the air bridges in the travel lane and the additional costs associated with the installation of the crossing itself." **Exhibit 6** (McCoy Dep., Ex. 13).

28.     On October 24, 2011, Precision submitted two change orders that included a "per crossing" cost for unknown foreign crossings. *See* **Exhibit 7** (Change Order 10-137-04, Change Order 10-137-05).

29.     Dominion responded that it required supporting documentation for the alleged costs and rates. Thereafter, Precision sent additional change orders and revisions of those change orders related to unknown foreign crossings. *See* **Exhibit 8** (Change Order 10-137-04 Rev 1); **Exhibit 9** (Change Order 10-137-70); **Exhibit 10** (Change Order 10-137-70 Rev 1).

30.     Around this time, Precision and DTI entered into a "Final Settlement" dated November 11, 2011 which stated, in relevant part: "1.) Precision has submitted a work plan for the remainder of 2011 as shown in Attachment #1 and [DTI] has agreed to such plan. 2.) Except as provided in Section 8 below, the balance of the 2011 work on both pipeline will be shifted to 2012 along with the originally planned 2012 work . . . [a]s shown in the work plans, Precision will begin the 2012 work as early as practical, but by no later than March 26, 2012." **Exhibit 11**, ¶¶ 1, 2.

31.     As part of that Final Settlement, the parties agreed that Precision would be paid $6,000,000; as part of that payment "if . . . the work progression is on schedule and environmentally sound then Precision shall invoice, and Dominion shall pay, the amount of three million dollars ($3,000,000) by the close of business on December 31, 2011." **Exhibit 11**, ¶ 4.

32.     Precision completed construction on TL-590 and achieved the ready for service date by placing TL-590 into service on August 15, 2012. **Exhibit 12** (Moody Dep. 103:1-9).

33.     At no point either before, during, or after the project did Dominion agree to pay any of the costs associated with the aforementioned change orders (¶¶ 28, 29). **Exhibit 13** (McCoy Dep. 161-163).

34.     Only nine (9) change orders remain in dispute with respect to TL-590. *See* Joint Stipulation of Partial Dismissal with Prejudice (ECF No. 129). These remaining change orders do not relate to Precision's claim for damages based on unknown foreign crossings. *See* **Exhibit 14**.

35.     The Contract explains the specific procedure for submitting change orders under Article 12:

> Article 12.2: <u>Contractor Requests for a Change Order</u>. If Contractor desires a Change Order, Contractor shall give Dominion Notice within five (5) days, after Contractor knows or should have known of the occurrence of the event giving rise to such request. Such Notice shall include an appropriate statement setting forth the reasons why Contractor believes additional compensation or additional time should be granted, the detailed nature of any costs to be incurred, including reasonable adjustment to other applicable Contract provisions, and the probable length of any delay in performance of the Work. If Dominion accepts any such change request, a Change Order shall be executed by the Parties and the Contract Price, Project Schedule, or other applicable Contract provisions or exhibits, as the case may be, shall be adjusted in accordance with the terms of such Change Order.

> Article 12.2.1: <u>Failure to Comply Deemed a Waiver</u>. Failure to comply with the requirements of this Section 12.2 shall constitute a waiver by Contractor of any and all Contractor requests for Change Orders not pursued in accordance with the terms herein.

**Exhibit 4** at 29.

36.     Precision submitted their own "Quality Management Plan (Version 2.0)," dated April 12, 2010, which was incorporated into the Contract as Exhibit G and states, in relevant part:

> 9.4 Change Order Documentation – Properly handling changes is essential to the success of a project. These inevitable changes must be fully documented and authorized by the customer BEFORE THE CHANGE WORK IS PERFORMED whenever possible. The customer needs to agree that the change is necessary and immediately provide written authorization which includes payment terms. . . . Examples: Customer adds new termination point, or Precision finds underground unknown obstruction while digging.

**Exhibit 15** at 12, 13 (Contract Ex. G – Contractor's QA/QC Program).

37.     Precision's failure to comply with the Contract's five-day notice requirement affects eight of the change orders that remain in dispute. Change Order 10-137-95 was submitted within the required time period, but failed to provide "an appropriate statement setting forth . . . the detailed nature of any costs to be incurred, including reasonable adjustment to other applicable Contract provisions, and the probable length of any delay in performance of the Work." **Exhibit 4**, Art. 12.2.

38.     Monte Pratt, Precision's Vice President for the Eastern Division, prepared and submitted these change orders on behalf of Precision. *See* **Exhibit 16** (Pratt Dep. 321:14-15, 331:3-9 (Change Order #93); 344:22, 345:1 (Change Order #55); 348:7-13 (Change Order #66); 354:1-11, 358:12-16 (Change Order # 69); 369:7-8 (Change Order #80); 391:7-13 (Change Order #87); 395:4-22, 396:1-15 (Change Order #95); 413:14-19 (Change Order #79); 418:5-14, 419:6-13 (Change Order #99)).

39.     On December 27, 2013, Precision, filed a negligent misrepresentation claim in federal court against Trico and GAI alleging that the Alignment Drawings contained in the Bid Documents did not identify all subsurface foreign crossings on the project, causing Precision to suffer economic damages. See *Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.) (ECF Nos. 1, 14), **Exhibit 1**.

40.     A copy of the Amended Complaint filed in *Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.) (ECF No. 14) is attached as **Exhibit 1**.

41.     As detailed in the Amended Complaint, Precision sought compensation from Trico and GAI for the "additional costs" it incurred when encountering unidentified foreign crossings on TL-590.  (*Id.*, ECF No. 14 at ¶¶ 58-63).

42.     On September 28, 2016, the U.S. District Court for the Western District of Pennsylvania granted summary judgment in favor of Trico and GAI finding that "[t]he record confirms, time and again, that Plaintiff had knowledge that the Defendants' drawings did not depict all crossings Plaintiff was bound to encounter." **Exhibit 17** (*Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.) (ECF No. 132 at 2)).

43.     On October 24, 2017, the judgment rendered by the district court in favor of Trico and GAI was affirmed by the U.S. Court of Appeal for the Third Circuit, which noted the following in its decision:

> Knowing that the drawings did not identify all the foreign crossings, Precision said to Dominion in the letter accompanying its bid: "We suspect there may be some quantity of unknown pipelines to cross . . . . We propose that, should Precision be the successful bidder, we negotiate a crossing price for unknown lines prior to the start of construction." However, Dominion and Precision did not do so, either before or after construction began.

**Exhibit 18** (*Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 16-3990 (3d Cir. Oct. 24, 2017)).

44.     Precision's current and former-employees have testified consistently with this position in this litigation. *See, e.g.*, **Exhibit 19** (Holley Dep. 20:8-16); **Exhibit 20** (Wade Dep. 31:9-18, 202:6-22, 203:1-22, 204:1); **Exhibit 21** (McKone Dep. 30:5-21); **Exhibit 22** (Poteete Dep. 19:5-15); **Exhibit 23** (Fischer Dep. 22:16-21).

## IV. ARGUMENT

Precision has alleged two types of claims: "claims that arise from the contracts, and other claims that arise under the separate legal theory of quantum meruit, also known as quasi-contract."

(ECF No. 56 at 3). On March 23, 2017, this Court partially granted Dominion's Motion to Dismiss allowing Precision's claim for breach of contract to proceed, explaining that while "[d]iscovery may disclose facts that allow Dominion to win the case based on [affirmative] defenses . . . they are not ripe at the motion to dismiss stage." (*Id.* at 6). This Court also allowed quasi-contract claims to proceed, finding that while "[a] party may not seek quasi-contract claims where an enforceable contract governs its claims . . . Precision adequately alleges that the work it performed fell outside of the Pipeline Contracts." (*Id.* at 9). Since that time, the parties have exchanged and reviewed over 150,000 documents in this matter and taken 28 depositions. Discovery has made one thing clear:  the undisputed material facts compel summary judgment in Dominion's favor on the majority of Precision's remaining claims.

### A. Precision is judicially estopped from asserting its quasi contract claims and those claims fail as a matter of law because the Contract governs the relationship between the parties.

Precision has three remaining quasi-contract claims: Count 1 (Cardinal Change – Quasi-Contract (Quantum Meruit); Count 5 (Quantum Meruit – Quasi Contract); and Count 8 (Unjust Enrichment – Quasi-Contract). However, based on the position taken by Precision in the prior litigation that disputes between the parties are governed by the Contract, Precision is judicially estopped from asserting these quasi-contract claims in this litigation. Additionally, under controlling Virginia law, "where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie." *WRH Mortgage, Inc. v. S.A.S. Associates*, 214 F.3d 528, 534 (4th Cir. 2000). Additionally, the statute of limitations applicable to quasi-contract under Virginia law precludes Precision from asserting a claim against Dominion for the nine change orders that remain in dispute. For these reasons,

Dominion is entitled to judgment as a matter of law on Precision remaining quasi-contract claims under Counts 1, 5, and 8.

**1.  Judicial estoppel entitles Dominion to judgment as a matter of law on Precision's remaining quasi-contract claims as this doctrine prevents Precision from taking the inconsistent position on whether the disputes that have arisen between the parties are governed by the Contract.**

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28-29 (4th Cir. 1995).

The Fourth Circuit has permitted district courts to apply judicial estoppel when:

(1) the party to be estopped is advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position is one of fact instead of law; (3) the prior position has been accepted by the court in the first proceeding; and (4) the party to be estopped has acted intentionally, not inadvertently.

*King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998). These elements are easily satisfied in this case, warranting a finding of judicial estoppel with respect to Precision's quasi-contract claims under Count 1 (Cardinal Change), Count 5 (Quantum Meruit), and Count 8 (Unjust Enrichment).

Dominion initially filed suit against Precision on July 11, 2013, alleging that Precision breached the parties' contract by submitting "change requests in bad faith, without a factual or legal justification, and in breach of the Pipeline Construction Contracts." *See Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, Civil Action No. 3:13cv442 (E.D. Va.). (ECF No. 1, ¶ 37). On August 5, 2013, Precision moved to dismiss the Complaint based on a lack of subject matter jurisdiction, arguing that Article 23 of the Contract required the parties to exhaust an

11

alternative dispute resolution process before litigating. In support of its argument, Precision represented that "[i]t is undisputed that Precision's and Dominion's claims both arise out of the Contracts." *Id.* (ECF No. 7-1 at 8).

This Court relied on that representation by granting Precision's motion to dismiss. Specifically, the Court found that the Article 23 required the parties to complete a mandatory dispute resolution process for "any dispute" that arose from the Contract. *Id.* (ECF No. 25 at 7). The Court also determined that "the dispute at issue (the validity of Precision's February 1, 2013 change orders) certainly falls within Article 23's purview." (*Id.* at n.4). This Court's closing remarks in the prior litigation are particularly relevant:

> Dominion and Precision, two sophisticated corporations, negotiated the instant contract at arms' length and with (no doubt) the advice and assistance of competent legal counsel. Precision, as the party insisting upon adherence to the terms of Article 23, is entitled to the 'benefit of its bargain.' Article 23 unambiguously requires that Dominion submit any dispute prior to commencing litigation. This Court will not substitute a judicial resolution for the parties' dispute when a valid, agreed-upon contractual remedy properly governs.

(*Id.* at 11).

Precision's quasi-contract claims rely on a position that is directly contrary to the position it previously held when moving to dismiss Dominion's lawsuit. Precision clearly and repeatedly asserted that *any* payment dispute Dominion had with respect to the project was subject to Article 23. The Court's opinion dismissing Dominion's Complaint on November 6, 2013 clearly relied on Precision's representation because it ultimately refrained from adjudicating the dispute because "[t]he Court will not substitute a judicial resolution for the parties' dispute when a valid, agreed-upon contractual remedy properly governs." (ECF No. 25 at 11). Accordingly, Precision should not be permitted to now claim that the Contract does not govern the payment disputes that resulted from the construction of TL-590.

Against this background, the Court should find that Precision has acted intentionally and not inadvertently. In short, this litigation is "a contractual dispute over change orders in a construction contract" and Precision should be judicially estopped from arguing otherwise. *See* (ECF No. 25 at 1).

> **2. Dominion is entitled to judgment as a matter of law with respect to Precision's remaining quasi-contract claims because the Contract governs the relationship between the parties.**

Pursuant to Article 24.2, the parties agreed that the Contract would be governed by Virginia law. In Virginia, "[w]here a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie." *WRH Mortgage, Inc. v. S.A.S. Associates*, 214 F.3d 528, 534 (4th Cir. 2000); *see also Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) ("An action for unjust enrichment is quasi-contractual in nature and may not be brought in the face of an express contract."); *Centex Construction v. Acstar Insurance Co.*, 448 F. Supp. 2d 697, 707 (E.D. Va. 2006) ("Virginia law provides no relief under a quantum meruit claim where a valid, express contract exists between the parties."). Additionally, "when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to their plain meaning." *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995).[1]

Here, the parties expressly agreed on how they would handle any work items that fell outside the Contract's scope of work. If the additional work was directed by Dominion, it was

---

[1] *See also Golding v. Floyd*, 539 S.E.2d 735, 737 (Va. 2001) ("The guiding light is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares. Thus, if the intent of the parties can be determined from the language they employ in their contract, parol evidence respecting their intent is inadmissible. An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time.").

13

classified as "Extra Work" pursuant to Article 3.5, and it required a written change order signed by both parties. *See* **Exhibit 4**, Art. 12.1. Alternatively, if Precision initiated a change order request, it was required to provide notice of the work to Dominion within five days of learning of that additional work would be needed. *See* **Exhibit 4**, Article 12.2.  If Dominion agreed with the request, the parties were to sign a change order and adjust the contract price accordingly.  *See id.* If Dominion rejected the request, then Precision had no obligation to complete the work item because its obligations remained defined by the contractual scope of work.  Finally, under Article 12.9, Precision was obligated to complete any Dominion-directed work even if the parties could not agree on a price, but it reserved its right to dispute the price following project completion.

At best, Precision submitted a request for additional work on foreign crossings through Change Order 10-137-04, Change Order 10-137-05, and Change Order 10-137-04 Rev 1. **Exhibit 7, 8**. However, these requests for payment related to unknown foreign crossings not only failed to comply with the parties' agreed-upon procedures in Article 12.2, they were contrary to the assumption of risk provision that Precision agreed to under the Contract. *See* **Exhibit 12** (Moody Dep. 69:8-19, 70:6-12, 115:3-22, 116:1-9); **Exhibit 13** (McCoy Dep. 161-163). Precision had no contractual obligation to complete any work that it believed was outside the scope, unless directed to do so by Dominion. If Dominion directed the foreign crossings work, then Precision had the right to require a Dominion-initiated change order, pursuant to Article 12.1. Instead, Precision allowed the matter to lie dormant for the remainder of construction until after it was entitled to a $3 million bonus on August 15, 2012. *See* **Exhibit 11**. Then, days later, Precision submitted Change Order 10-137-70, in which the per-crossing price inexplicably increased from $17,900 to more than $57,000. *See* **Exhibit 9**. Two months later, that price jumped again to $88,505.73 per

crossing.[2] *See* **Exhibit 10**. Precision's experts have now revised this number on three separate occasions relying on backup documentation that Precision's own employees have stated does not provide the information needed to properly calculate the costs incurred when encountering an unknown foreign crossing as these calculations require making several assumptions concerning the nature of the specific crews and the time actually devoted to work associated with unknown foreign crossings. *See* **Exhibit 16** (Pratt Dep. 294-311).

Additionally, the productivity claim originally submitted to Dominion as Change Order 10-137-101 was submitted without written notice to Dominion at the time Precision was allegedly suffering these losses. **Exhibit 16** (Pratt Dep. 276:5-11, 279:19-22, 280:1-5). Precision also made the initial submission, which sought compensation in the amount of $28,486,000.00, without reference to supporting backup information at that time. *Id.* (Pratt Dep. 285:1-10). Precision's former employee who testified to calculating the productivity loss on TL-590 was also unable to recall his methodology in calculating the loss of productivity claim that allegedly began in March 2012. *Id.* (Pratt Dep. 282:11-17).

Recognizing its failure to comply with Article 12, Precision resorts to a quasi-contract theory to recover damages associated with extra work that Precision claims was outside the scope of the Contract. However, Precision's theory is precluded by well-settled Virginia law. *See Main v. Department of Highways*, 142 S.E.2d 524, 530-31 (Va. 1965) ("As has been said, the written contract which the plaintiffs executed clearly provided the method by which they could insure the

---

[2] Change Order 10-137-70, which is dated August 20, 2012, requested payment of a lump sum cost of $8,151,661.17 and states "[t]his change order request reflects costs for 142 of those unidentified foreign crossings." **Exhibit 9**. That equates to $57,406.06 per crossing. Change Order 10-137-70 Rev 1, which is dated October 10, 2012, requested payment of a lump sum cost of $12,567,813.28 and also states "[t]his change order request reflects costs for 142 of those unidentified foreign crossings." **Exhibit 10**. That equates to $88,505.73 per crossing.

recovery of the cost of such extra work, and not having followed the prescribed method, they are not entitled to such recovery."); *Atlantic & Danville Ry. Co. v. Delaware Const. Co.*, 37 S.E. 13, 16 (Va. 1900) ("Such a [change order] provision is a wise, and not an unusual, one in building contracts, and it is held by the authorities to be obligatory upon the parties, and not to be disregarded.").

Courts have consistently enforced change order provisions to preclude quasi-contract claims. *See, e.g.*, *Pennsylvania Elec. Coil, Ltd. v. City of Danville*, 329 F. App'x 399, 404 (4th Cir. 2009) (holding that "quantum meruit relief is not available to [plaintiff] because there is a valid, enforceable contract that governs the parties' rights and lays out a change order procedure"); *Carolina Conduit Sys., Inc. v. MasTec North America, Inc.*, No. 3:11CV133, 2011 WL 5042082, at *4 (E.D. Va. 2011) ("[W]here there is a method under the contract by which a party can insure the recovery of the cost of extra work, that party is not entitled to recovery where it fails to follow that method."); *Artistic Stone Crafters v. Safeco Ins. Co.*, 726 F. Supp. 2d 595, 604 (E.D. Va. 2010) ("Therefore, because the Subcontract specifies a process for the reimbursement of additional, unanticipated costs . . . Artistic is unable to obtain such reimbursement under a theory of quantum meruit."); *Perry Eng'g Co. v. AT&T Comm'ns, Inc.*, No. 90-153, 1992 WL 201944, at *7 (W.D. Va. July 31, 1992) (awarding summary judgment on quantum meruit claim because of express change order provision).

For these reasons, in the event the Court determine that Precision is not estopped from asserting its remaining quasi-contract claims, those claims also fail as a matter of law because the disputes between the parties in this litigation are governed by the Contract.

> **3.  The statute of limitations applicable to quasi contracts under Virginia law precludes Precision from asserting a claim against Dominion for the nine remaining change orders.**

Precision's quasi contract claims are also time barred.  Precision asserts unjust enrichment, quantum meruit, and other unspecified theories of recovery in connection with work performed on the unidentified foreign line crossings and nine remaining change orders. The statute of limitations for unjust enrichment and quantum meruit claims is three years. Va. Code Ann. § 8.01-246(4); *Harbour Gate Owners Association v. Berg*, 348 S.E.2d 252 (Va. 1986). To the extent Precision asserts other non-contractual theories of recovery, they would be barred by the catch-all, two year statute of limitations. Va. Code Ann. § 8.01-248 ("Every personal action … for which no limitation is otherwise prescribed, shall be brought within two years after the right to bring such action has accrued.")  In sum, the longest statute of limitation period applicable to Precision's non-contractual claims is three-years.

Precision filed its Complaint on July 28, 2015.  Thus, claims for any work performed prior to July 28, 2012 are time-barred. With respect to the nine remaining change orders—all involve work that was performed prior to July 28, 2012.  *See* **Exhibit 14**. For Change Orders 55, 66, 69, 99, all work in connection with those change order was completed prior to July 28, 2012. *Id.* For Change Orders 79, 80, 87, 93 and 95, work was commenced on each of those change orders prior to July 28, 2012—any work performed prior to that date would be time-barred. *Id.* Likewise, claims relating to any work performed on the unidentified foreign line crossings that was completed on or before July 28, 2012 are similarly time-barred.

**B. Precision's unknown foreign crossings claim is barred by the doctrine of collateral estoppel and is further preempted to the extent Precision relies on the Pennsylvania One Call statute as the basis for Dominion's alleged breach of Article 10.2.1.**

This case is Precision's attempt to relitigate the same factual and legal issues that concern the Alignment Drawings prepared by Trico and presented by Dominion, which were previously resolved against Precision in the U.S. District Court for the Western District of Pennsylvania.

17

*Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc., et al.*, No. 2:13cv1823 (W.D. Pa.), *aff'd*, No. 16-3990 (3d Cir. Oct. 24, 2017). Additionally, to the extent Precision has alleged that Dominion violated the "Covenant to Follow Laws and Codes" under Article 10.2.1 of the Contract, those alleged violations require the application of state law, which is clearly preempted by the Pipeline Safety Improvement Act ("PSA"), 49 U.S.C. §§ 60101 *et seq.*

**1.  Precision is collaterally estopped from relitigating the issues concerning Precision's reliance on Alignment Drawings in connection with its claims related to unknown foreign crossings.**

"The doctrines of res judicata and collateral estoppel essentially say that a litigant only gets one bite at the apple to try a case. Once a case is won or lost, the parties may not relitigate the same issues again." *Columbia Gas Transmission, LLC v. David N. Martin Revocable Trust*, 833 F. Supp. 2d 552, 557 (E.D. Va. 2011) (Gibney, J.). "[W]hen federal jurisdiction in a prior case is based on diversity of citizenship, for any subsequent suit in federal court, federal law incorporates the preclusion law of the state in which the court that rendered judgment in the prior suit sits." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 Fed. App'x 256, 261 (4th Cir. 2008) (citing *Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)). Thus, Pennsylvania's law on collateral estoppel will apply.

 "Collateral estoppel is also referred to as issue preclusion. It is a broader concept than res judicata and operates to prevent a question of law or issue of fact which has once been litigated and fully determined in a court of competent jurisdiction from being relitigated in a subsequent suit." *Catroppa v. Carlton*, 998 A.2d 643, 646 (Pa. Super. Ct. 2010). According to Pennsylvania case law, "collateral estoppel will bar a subsequent cause of action if four elements are met: (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a

party or in privity with the party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue and question in a prior action." *Pat's Auto Sales v. Comm. Dep't of Transp.*, 744 A.2d 355, 358 (Pa. Super. Ct. 2000).

Here, the doctrine of collateral estoppel bars Precision from establishing either a contractual or quasi-contractual claim against Dominion for unknown foreign crossings. Based on the findings made in *Precision Pipeline, LLC v. Trico Surveying and Mapping, Inc.*, No. 2:13cv1823 (W.D. Pa.), it has been firmly established that Precision did not rely on the Alignment Drawings as the final authority for identifying all foreign crossings. Indeed, the Court found that "the record confirms, time and again, *that Plaintiff had knowledge that Defendants' drawings did not depict all crossings Plaintiff was bound to encounter.*" **Exhibit 17** at 2. As a result, another court has already found that to the extent Precision relied on Alignment Drawings to identify all subsurface utilities along the pipeline's proposed route "its reliance was unjustified." *Id.* at 9.

This litigation has only served to confirm Precision's expectations with respect to this issue. Precision's bid transmission letter represented that the company was "uniquely qualified to perform this work" based on "a deep field of highly experienced and extremely qualified people" and directly states that Precision has "worked successfully in the rugged mountains of the Marcellus area." **Exhibit 3** (Bell Dep., Ex. 35). The letter also mentions Precision's suspicion that "there may be some quantity of unknown pipelines to cross on these projects," demonstrating that Precision knew the Alignment Drawings would not provide an accurate count for all subsurface utilities. (*Id.*). However, despite referencing these unknown foreign crossing as a potential risk/mitigation issue, Precision stated: "We do not feel these unknown pipelines pose an unacceptable risk in terms of safety or our ability to install pipe as per our schedule." (*Id.*).

As in the previous lawsuit, current and former Precision employees have continued to testify that contractors expected to encounter additional foreign crossings apart from those shown on pre-bid alignment sheets. *See, e.g.*, **Exhibit 19** (Holley Dep. 20:8-16); **Exhibit 20** (Wade Dep. 31:9-18, 202:6-22, 203:1-22, 204:1); **Exhibit 21** (McKone Dep. 30:5-21); **Exhibit 22** (Poteete Dep. 19:5-15); **Exhibit 23** (Fischer Dep. 22:16-21). Precision cannot relitigate this issue and hope for a different result. It has already been determined that Precision knew, both before submitting its bid and after construction began, that these alignment drawings did not depict all foreign crossings. Furthermore, that determination was essential to the prior judgment on Precision's negligent misrepresentation claim. *See Dominion Resources Inc. v. Estate of David Griffin*, No. 3:15cv407, 2016 WL 4071969, at *n.1 (E.D. Va. July 16, 2016) (quoting *Lee v. Spoden*, 776 S.E.2d 798, 803 (Va. 2015); *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

This case is Precision's attempt to relitigate the same factual and legal issues that were previously resolved against them. The factual issue is Precision's pre-bid knowledge concerning what the alignment sheets depicted; the legal issue is whether there was any corresponding duty for those alignment sheets to maintain a certain level of accuracy. That court also found that "[a]gents of Dominion . . . have testified, uniformly and consistently, that it was not their intention that all underground crossings would be identified; rather, Defendants' identification of crossings was limited to above-ground crossings and underground crossings evidenced by above-ground markers." *Precision Pipeline*, No. 2:13cv1823 (ECF. No. 132 at 1). The same has been true in this litigation. *See, e.g.*, **Exhibit 24** (McCoy Dep. 27:3-19); **Exhibit 12** (Moody Dep. 39:5-18); **Exhibit 25** (Park Dep. 92:3-14, 97:3-15). Because the doctrine of collateral estoppel prevents Precision from relitigating its pre-bid knowledge of foreign crossings it cannot establish either a contractual

or quasi-contractual claim against Dominion with respect to the costs associated with unknown foreign crossings and Dominion is entitled to judgment as a matter of law.

   2.   **Precision cannot establish a breach under Article 10.2.1. by relying on Pennsylvania's One-Call Act because federal law preempts the requirements imposed by state law with respect to interstate natural gas pipelines.**

As noted in the Complaint, "[t]he federal government primarily regulates the natural gas industry through the Federal Energy Regulatory Commission ('FERC') which oversees the transportation and sale of natural gas in interstate commerce." (Compl. ¶ 35). Here, Precision contends that "the contract applicable to TL-590 . . . through its definition of 'Local Laws' and Section 10.2.1, require Dominion to follow the Pennsylvania One Call Act." *See* (Interrogatory No. 3, Precision Pipeline's Answers to Dominion Transmission, Inc.'s First Set of Interrogatories). However, the doctrine of preemption defeats any attempt by Precision to establish a breach under Article 10.2.1 with respect to the Pennsylvania One Call Act.

The safety standards applicable to interstate pipelines are governed by the Pipeline Safety Improvement Act ("PSA"), 49 U.S.C. §§ 60101 *et seq.* Under the PSA, "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." *Id.* § 60104(c). However, "[n]otwithstanding the preceding sentence, a State authority may enforce a requirement of a one-call notification program of the State *if* the program meets the requirements for one-call notification programs under this chapter or chapter 61." *Id.* (emphasis added). Pennsylvania's One Call Act failed to meet these requirements at the time Dominion provided the Construction Alignment Sheets to Precision for TL-590 (i.e., October 25, 2010). Accordingly, Dominion's compliance obligations with respect to underground line location and notification were limited to requirements under federal law and specific agreements under the TL-590 Contract.

The PSA's defined purpose is "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1) (2006). Congress instructed the Department of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities," which are enforced by the Department of Transportation's Pipelines and Hazardous Materials Safety Administration ("PHMSA"). *Id.* § 60102(a)(2). The PSA also contains an express preemption provision, which states:

> A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.

49 U.S.C. § 60104(c) (2006) (emphasis added).  Accordingly, the Fourth Circuit has held that "the PSA expressly preempts state and local law in the field of safety."  *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412, 420 (4th Cir. 2013) (citing *Tenneco, Inc. v. Public Service Commission of West Virginia*, 489 F.2d 334, 336 (4th Cir. 1973).[3] However, the PSA explicitly provides that "a State authority may enforce a requirement of a one-call notification program of the State *if* the program meets the requirements for one-call notification programs under this chapter or chapter 61."  49 U.S.C. § 60104(c) (emphasis added).

The findings made by the Federal Energy Regulatory Commission indicate that TL-590 is an *interstate* pipeline — specifically a 30-inch-diameter pipeline extending from Greene County,

---

[3] *See also Northern Natural Gas Co. v. Munns*, 254 F. Supp. 2d 1103, 1110 (S.D. Iowa 2003) ("The materials natural gas pipeline companies file for review [with FERC] must address conditions both during and after construction to restore the affected land. The breadth of these statutes and regulations, when combined with extensive safety regulations applicable to pipeline construction, compel the conclusion that Congress has occupied the field of interstate gas pipeline regulation, including land maintenance and restoration standards.").

Pennsylvania to Marshall County, West Virginia. Therefore, Dominion is obligated to follow the requirements of Pennsylvania's One Call system *if* that program meets the requirements   for one-call notification programs under the PSA.  Title 49, Chapter 61 sets forth the "minimum standards" for these programs as follows:

> In order to qualify for a grant under section 6106, a State one-call notification program, at a minimum, shall provide for –
>
> (A)  appropriate participation by all underground facility operators, including all government operators;
>
> (B)  appropriate participation by all excavators, including all government and contract excavators; and
>
> (C)  flexible and effective enforcement under State law with respect to participation in, and use of, one-call notification systems.

49 U.S.C. § 6103(a)(1).  This section also provides that "a State one-call notification program may not exempt municipalities, State agencies, or their contractors from the one-call notification system requirements of the program."  *Id.* § 6103(a)(2).

Pennsylvania's One Call system has failed to meet these requirements for several years. Prior to 2017, the Pennsylvania Department of Transportation, municipalities, and some natural gas pipeline operators were exempt from the One Call system.[4]  "Those exemptions make the state ineligible for several federal safety grants, costing the [Pennsylvania Public Utility Commission] and PA One Call about $250,000 a year."  *See* Maykuth, Andrew, *Marking One's Turf in the Underground Tangle of Circuits and Pipelines*, PHILADELPHIA INQUIRER (May 23, 2016).[5]  In February 2016, Representative Matthew Baker introduced legislation in the Pennsylvania House

---

[4] Specifically, natural gas pipelines in designated "Class 1" rural areas were exempt from notification and reporting requirements as well as operators of approximately 12,000 miles of "gathering pipelines," which connect gas wells to larger regulated pipelines.

[5] *Available at* http://www.philly.com/philly/business/20160523_Marking_one_s_turf_in_the_underground_tangle_ of_circuits_and_pipelines.html.

23

of Representatives to amend the One Call Act. The amendment transfers enforcement authority

from the Department of Labor and Industry to the Public Utility Commission ("PUC"), creates a

damage prevention committee, removes the aforementioned exemptions, creates additional limited

exemptions, places addition duties on facility owners, excavators, and project owners, and creates

an administrative process related to violations and the assessment of penalties.  During testimony

before the House Consumer Affairs Committee on June 5, 2017, the Commissioner of the

Pennsylvania Public Utility Commission stated, in relevant part:

> Presently, the law has several exemptions from the requirement to notify the One
> Call system for purposes of locating and marking underground facilities before
> performing excavation.
>
> . . . HB 284 and SB 242 remove these exemptions from the law, and the
> Commission continues to believe removal of the exemption for crude oil or natural
> gas production and gathering lines or facilities is necessary to truly enhance safety
> and protect the public. Also, PHMSA has noted that any exemption in state law
> must be supported with data showing that such an exemption is reasonable and does
> not pose a substantial safety risk.  It is important to note that exemptions may
> adversely impact a portion of the Commission's federal pipeline safety grant, if
> Pennsylvania's enforcement program is found to be inadequate.
>
> The removal of the exemption for political subdivisions and PennDOT has changed
> in recent weeks after continuing discussions with PennDOT and PHMSA.
> PennDOT has argued that the removal of its exemptions in the One Call Law would
> cost tens of millions of dollars in compliance costs. In response, ***PHMSA has stated
> that the problematic language in the PA One Call law is the explicit exemption
> for "political subdivisions" and "employees of the Department of Transportation
> performing within the scope of their employment." Removal of that language,
> while retaining the work done by municipalities and the state, would be sufficient
> for PA to receive its One Call grant funding from PHMSA.***

*See* Testimony of John F. Coleman, Jr., House Bill 284/Senate Bill 242, Pennsylvania House of

Representatives, Consumer Affairs Committee (June 5, 2017) *available at* http://www.puc.state.

pa.us/General/pdf/Testimony/Coleman-HB284-SB242_Testimony060517.pdf (emphasis added).

This legislative history demonstrates that Pennsylvania has remained non-compliant with the

"minimum standards" under the PSA.  Thus, Precision cannot assert a cognizable claim for breach

of "applicable 'One Call System' laws" (Compl. ¶ 139) or related "Common Ground Alliance best practices" (Comp. ¶ 259) because Dominion's compliance obligations were limited to federal law and specific agreements under the Contract.[6]

Precision's ability to recover for the alleged "costly and time consuming efforts" that resulted after encountering an unknown foreign crossing (Compl. ¶ 117) depends entirely on whether the One Call Act applies to TL-590. The PSA allows a state to enforce the requirements of a one-call notification program *if* the program meets the requirements for one-call notification programs under the PSA. Here, the legislative history demonstrates that Pennsylvania's exemptions for "political subdivisions," the Pennsylvania Department of Transportation, and certain natural gas providers prevented the One Call Act from satisfying the necessary "minimum standards." The fact that recent amendments have sought to bring the One Call Act into compliance with the PSA cannot support Precision's claim that "[w]hen designing the Pipeline Projects, Dominion failed to satisfy its obligations under the Act and failed to comply with the Common Ground Alliance best practices." (Compl. ¶ 259). At the time Dominion provided the Construction Alignment Sheets for TL-590 to Precision, Pennsylvania's One Call system did not comply with the "minimum requirements" under the PSA, and therefore, Dominion's obligations were limited to those under federal law and specific agreements under the TL-590 Contract.

### C. There is no genuine dispute of material fact that would allow a reasonable jury to find in favor of its claim for breach of contract (Count 4).

Precision's claim for breach of contract also fails because nothing in the record allows Precision to establish a genuine dispute regarding whether Dominion breached the contractual

---

[6] For example, the "Exhibit B Addenda" provides that "the Miss Utility of WV and the PA 'One Call' system will be contacted a minimum of three working days prior to the start of construction work to verify and mark utilities along the Project work areas." *See* TL-590 Contract, Exhibit B at 5.

provisions governing change orders (Article 12.2), assumption of risk (Article 3.7), applicable laws and codes (Article 10.2.1), invoices for extra work (Article 8.2.5), and retainage (Article 7.1). Instead, the record demonstrates that Precision is the party who has failed to comply with its contractual obligations. Lastly, to the extent the record demonstrates instances in which Dominion failed to demand strict compliance with these provisions, the Contract itself states that "[t]he failure of Dominion to demand strict performance of the terms of, or to exercise any right conferred in, this Contract shall not be construed as a waiver or relinquishment of its right to assert or rely upon any such terms or right in the future, or a consent to any continuing or subsequent failure or breach." **Exhibit 4**, Art. 24.3.

### 1.  Foreign Line Crossings

On November 7, 2017, this Court issued an Order granting Dominion's Motion to Compel in part and directed Precision to provide the following information with respect to each foreign line crossing for which it seeks to recover damages: ". . . the count(s) in the complaint for which the plaintiff seeks damages related to the crossing." (ECF No. 103). On December 5, 2017, Precision served its Amended Second Supplement to Dominion Transmission, Inc.'s Second Set of Interrogatories, which stated: "Pursuant to the Court's Order, Precision submits and refers to the attachment hereto (the 'Attachment'). Precision seeks the amounts identified in the attachment under Counts 1, 3, 5, and 8 of the Complaint." *See* **Exhibit 26**. Accordingly, Precision is pursuing the damages that allegedly resulted from unknown foreign crossings as quasi contract claims, not as a claim for breach of contract under Count 4.

### 2.  Change Orders and Invoices

Dominion did not breach the Contract by failing to approve the change orders that remain in dispute because eight of those change orders failed to comply with the 5-day notice period under

Section 12.2 and Precision failed to provide supporting documentation in a timely manner with respect to all those change orders. *See* **Exhibit 16** (Pratt Dep. 321-430). The chart below summarizes the undisputed facts that Precision confirmed in response to Dominion's First Set of Requests for Admission (**Exhibit 27**) with respect to the date Precision submitted these change orders and when Precision performed the alleged work:

| Change Order | Description | Date Submitted | Issue Known vs. Submittal |
|---|---|---|---|
| 10-137-55 | Drainage Improvements to Kennel Road Yard (work performed and costs incurred between March 10, 2012 through March 17, 2012). *See* RFA Nos. 5-7. | 3/27/12 | 15 |
| 10-137-66 | TL-377 gate setting at Burch Ridge Compressor Station (work performed and costs incurred from June 10, 2012 through June 22, 2012 and from July 11, 2012 and July 18, 2012). *See* RFA Nos. 9-11. | 7/25/12 | 45 |
| 10-137-69 | Re-route in West Virginia due to large earthen slip (work performed and costs incurred from July 11, 2012 through July 25, 2012). *See* RFA Nos. 16-18. | 8/20/12 | 142 |
| 10-137-79 | TL-377 gate setting at Burch Ridge Compressor Station (work performed and costs incurred from July 19, 2012 through August 12, 2012). *See* RFA Nos. 9-11. | 8/15/12 | 27 |
| 10-137-80 | Additional welds to install pups due to poor quality line fittings (work performed and costs incurred from July 9, 2012 to September 16, 2012). *See* RFA Nos. 27, 28. | 8/17/12 | 169 |
| 10-137-87 | Additional environmental inspectors from Houston Inspection Field Services work performed and costs incurred from July 9, 2012 through September 16, 2012. *See* RFA Nos. 33-35. | 9/7/12 | 113 |
| 10-137-93 | Additional environmental inspectors from June 2012 through August 2012 (work performed and costs incurred from June 2012 through August 2012). *See* RFA Nos. 40-42. | 9/26/12 | 132 |
| 10-137-95 | Delays related to hauling materials to Traders Path (labor and equipment delays occurring on or before September 27, 2012). *See* RFA Nos. 47-49. | 9/14/12 | 3 |

| 10-137-99 | Additional 12,222 feet of rock ditch footage (work performed and costs incurred from March 2012 through June 2012). *See* RFA Nos. 51-53. | 12/16/12 | 264 |
|---|---|---|---|

Moreover, as previously stated, the non-waiver provision under Article 24.3 of the Contract precludes Precision from arguing that the failure of Dominion to demand strict performance in some instances relieved Precision from further compliance with the submission requirements. Waiver must be the voluntary and intentional abandonment of a known legal right. *See, e.g.*, *Bermueller v. Minnick*, 383 S.E.2d 722, 725 (Va. 1989). This Court has previously rejected arguments that have attempted to establish the oral modification of a written contract when the contractor continued to submit written change order requests even after the alleged "waiver" occurred. *See Carolina Conduit Systems, Inc. v. MasTec North Am., Inc.*, 2011 U.S. Dist. LEXIS 122578 (E.D. Va. Oct. 24, 2011).

Considering its contractual shortcomings, Precision argues that Dominion waived its right to enforce the change order procedures by approving a number of change orders that failed to comply with the contractual requirements. This argument finds no support in either the law or the facts. First, the Contract contains an "Entirety" provision that precludes Precision's reliance on anything other than the contract documents. The provision reads as follows:

> This Contract, together with all attachments and incorporated references, is the entire agreement between [Dominion] and [Precision] with respect to the Work and supersedes any prior or contemporaneous agreement or understanding between the Parties regarding the subject matter hereof. *The Parties shall not be bound by or be liable for any statement, representation, promise, inducement or understanding of any kind or nature not set forth or provided for herein.* No prior course of dealing, usage of trade or course of performance shall be used to supplement or explain any term, condition or instruction used in this Contract, *nor shall the same be deemed to effect any amendment hereto.*

Article 2.3 (emphasis added).  At least one court has enforced a similar contractual provision to preclude contract claims relying on waiver of change order procedures.  *See, e.g.*, *Service Steel Erectors Co. v. SCE, Inc.*, 573 F. Supp. 177, 179 (W.D. Va. 1983).

Second, the Contract includes a non-waiver provision. Article 24.3 provides that any "failure of [Dominion] to demand strict performance of the terms of, or to exercise any right conferred in, this Contract shall not be construed as a waiver or relinquishment of its right to assert or rely upon any such term or right in the future, or a consent to any continuing or subsequent failure or breach."  This provision must be enforced unless Precision can prove waiver by "clear, precise and unequivocal evidence." *Virginia Polytechnic Inst. & State Univ. v. Interactive Return Svc., Inc.*, 595 S.E.2d 1, 6 (Va. 2004).  In the context of change orders, "a definite agreement to pay is required to establish a waiver." *Service Steel*, 573 F. Supp. at 180.  Here, Precision cannot prove a definite agreement in which Dominion agreed to pay these change orders.  To the contrary, Dominion expressly rejected several change orders *because* Precision failed to comply with Article 12. Furthermore, Precision's employees have testified that no formal agreement was reached with respect to waiver of the contractual notice requirements.  *See* **Exhibit 16** (Pratt Dep. 449-50).

## V. CONCLUSION

For these reasons, there is no genuine dispute over any material fact and Dominion is entitled to judgment as a matter of law. Accordingly, the Court should grant Dominion's Motion for Partial Summary Judgment and enter judgment in favor of Dominion on Count 1 (Cardinal Change – Quasi Contract), Count 4 (Breach of Contract), Count 5 (Quantum Meruit – Quasi Contract), and Count 8 (Unjust Enrichment – Quasi Contract).

Dated:  January 18, 2018                         Respectfully Submitted,

                                                 **DOMINION TRANSMISSION, INC.**
                                                 By Counsel

*/s/ M. Melissa Glassman*_____
M. Melissa Glassman (VSB #27526)
John D. Wilburn (VSB #40411)
Heather B. Chaney (VSB #78313)
Robert J. Farlow (VSB #87507)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA  22102
Telephone: (703) 712-5000
Facsimile: (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
hchaney@mcguirewoods.com
rfarlow@mcguirewoods.com

Ryan D. Frei (VSB #70996)
Ashley P. Peterson (VSB #87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
rfrei@mcguirewoods.com
apeterson@mcguirewoods.com

*Counsel for Dominion Transmission, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed using the CM/ECF System which will send a notice of electronic filing (NEF) to all counsel of record.

Christopher J. Belter (*pro hac vice*)
Ryan G. Pitman (*pro hac vice*)
GOLDBERG SEGALLA, LLP
665 Main Street
Buffalo, NY 14203
Telephone: (716) 566-5400
Facsimile: (716) 566-5401
cbelter@goldbergsegalla.com
rpitman@goldbergsegalla.com

Thomas M. Wolf (VSB #18234)
Kenneth T. Stout (VSB #88027)
LECLAIRRYAN
919 East Main Street, 24th Floor
Richmond, VA 23219
Telephone: (804) 916-7143
Facsimile: (804) 916-7243
thomas.wolf@leclairryan.com
kenneth.stout@leclairryan.com

*Counsel for Precision Pipeline, LLC*

*/s/ M. Melissa Glassman*
*Counsel for Dominion Transmission, Inc.*

97992388_20

31